## COMMONWEALTH vs. GENNARO ANGIULO.

Essex. January 5, 1993. - June 11, 1993.

Present: LIACOS. C.J., WILKINS. ABRAMS, NOLAN. LYNCH, O'CONNOR, & GREANEY, JJ.

*Homicide. Accessory and Principal. Practice, Criminal*, Capital case,
Grand jury proceedings, Venue, Jury and jurors, Presence of defendant,
Interrogation of jurors. *Evidence*, Grand jury proceedings, Wiretap,
Joint enterprise. *Grand Jury. Electronic Surveillance. Joint Enterprise.
Jury and Jurors. Constitutional Law*, Jury.

A defendant convicted as an accessory before the fact to the crime of mur-
der in the first degree is a "capital" defendant entitled to appellate re-
view by this court under G. L. c. 278, § 33E. [507-510]

Evidence before a grand jury was sufficient to warrant a defendant's in-
dictment as an accessory before the fact to murder in the first degree.
[510-511]

Presence of an assistant United States attorney in a grand jury room, to
render aid to an assistant district attorney in the presentation of evi-
dence, was permissible under rule 5 (c) of the Massachusetts Rules of
Criminal Procedure, where there was no showing that his presence
compromised the truth-seeking function of the grand jury proceeding
and where control of the case remained with an authorized officer of
the Commonwealth, here an assistant district attorney. [511-513]

In a grand jury proceeding, it was permissible for a Federal agent to read
to the grand jury from the transcript of tape recordings made during
Federal electronic surveillance, instead of having the jurors listen to the
actual recordings, in the absence of any showing that information con-
cerning the quality of the recordings would have been significant to the
jurors' deliberations. [513-514]

At a criminal trial, the circumstance that a large percentage of the pro-
spective jurors were excused for various reasons did not, in itself, raise
any question as to the impartiality of the qualified jurors so as to war-
rant a change of venue. [514-516]

The discovery provision of the Massachusetts wiretap statute, G. L. c. 272,
§ 99 O 1, under which a criminal defendant is entitled to copies of all
recordings made during electronic surveillance, is not applicable to in-
terceptions made by Federal agents authorized by order of a Federal
court. [516-518]

The judge at a criminal trial properly admitted in evidence certain tape-recorded statements, under the exception to the hearsay rule for statements made by a joint criminal venturer in furtherance of a joint enterprise, where, in the circumstances, the judge could properly conclude that the declarant was acting to conceal the crime that formed the basis of the joint enterprise. [518-520]

In a prosecution for a crime punishable by death or by imprisonment for life, the "list of the jurors who have been returned," to which the defendant, or defense counsel, is entitled under G. L. c. 272, § 66, includes the prospective jurors' names and addresses, and the judge's failure to follow the mandate of the statute, at the trial of a defendant charged as an accessory before the fact to murder in the first degree, required reversal of the defendant's conviction. [520-526] NOLAN, J., with whom LYNCH, J., joined, dissenting.

This court announced a rule based on Federal due process principles that, henceforth, no anonymous jury is to be empaneled in a criminal case unless the judge first determines, on adequate evidence, that anonymity is necessary and has set forth his findings in writing; the court also stated that, if jurors become aware of their anonymity, the judge must take reasonable precautions to minimize the effect of the jurors' anonymity on their perception of the defendant. [526-529] NOLAN, J., with whom LYNCH, J., joined, dissenting.

It was error for a judge to exclude the defendant and his counsel from an examination of jurors conducted as the result of an incident occurring during a criminal trial. [530-531] NOLAN, J., with whom LYNCH, J., joined, dissenting.

INDICTMENT found and returned in the Superior Court Department on December 10, 1986.

Pretrial motions were heard by *Peter F. Brady*, J., and the case was tried before *John T. Ronan*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Anthony M. Cardinale* (*Robert L. Sheketoff* with him) for the defendant.

*Elin H. Graydon*, Assistant District Attorney, for the Commonwealth.

LIACOS, C.J. From January through May, 1981, the Federal Bureau of Investigation (FBI) conducted court-authorized surveillance at 98 Prince Street and 51 North Margin

Street in the North End section of Boston.[1] Utilizing audio and video equipment, Federal agents monitored and recorded arrivals and departures of persons from the above-described premises. Federal agents also monitored and recorded conversations that took place inside the premises.

Based in large part on the fruits of the electronic surveillance, a Federal grand jury returned a two-count indictment charging Gennaro Angiulo (defendant)[2] with "conspiring to engage in racketeering activities, among them, conspiring to murder and being [an] accessor[y] before the fact to the murder of Angelo Patrizzi," and substantive violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962 (c) and (d)(1988). The substantive violations alleged, inter alia, that the defendant conspired to murder Angelo Patrizzi and that the defendant was an accessory before the fact to Patrizzi's murder.

The case was tried to a jury in the United States District Court for the District of Massachusetts. The jury convicted the defendant. The Federal judge sentenced the defendant to forty-five years in prison and fined him $120,000.

After the Federal trial, a grand jury sitting in Essex County indicted the defendant on charges of conspiracy to murder, and of being an accessory before the fact to the murder of Angelo Patrizzi.[3] The defendant moved to dismiss the indictment arguing that the prior Federal prosecution barred the Commonwealth's prosecution. See *Commonwealth* v. *Cepulonis*, 374 Mass. 487 (1978). A judge in the

---

[1]The orders authorizing the electronic surveillance issued from the United States District Court for the District of Massachusetts. For a description of the court-authorized surveillance, see *United States* v. *Angiulo*, 897 F.2d 1169, 1176 (1st Cir.), cert. denied, 498 U.S. 845 (1990).

[2]The Federal grand jury also indicted Samuel Granito on the same charges.

[3]The indictment provided "that a person or persons unknown to the Grand Jury did assault and beat Angelo Patrizzi [the victim] with intent to murder him and by such assault and beating did murder Angelo Patrizzi; and that Gennaro Angiulo . . . did incite, procure, aid, counsel, hire or command a person or persons unknown to the Grand Jury to do and commit the murder."

Superior Court denied the defendant's motion to dismiss. The defendant sought interlocutory relief pursuant to G. L. c. 211, § 3 (1990 ed.). A single justice of this court reserved and reported the case to the full bench. We affirmed the motion judge's decision in part, allowing the Commonwealth to prosecute the defendant on the charge that he was an accessory before the fact to murder in the first degree; and we reversed in part, dismissing the conspiracy count on double jeopardy grounds. *Angiulo* v. *Commonwealth*, 401 Mass. 71 (1987).

Accordingly, the defendant was tried as an accessory before the fact to murder in the first degree. See G. L. c. 274, § 2 (1990 ed.). The trial took place in December, 1987. The jury returned a verdict of guilty. The judge sentenced the defendant to a term of life imprisonment. Asserting a number of errors, the defendant appealed. The appeal was entered in the Appeals Court. We took the case on our own motion. For the reasons set forth below, we reverse the defendant's conviction.

First, we summarize the relevant evidence. In 1978, Joseph Porter, Angelo Patrizzi's half-brother, was shot to death. Porter's body was found in a stolen automobile in Revere. Patrizzi believed that two individuals, Frederick Simone and Cono Frizi, were responsible for the murder. Patrizzi resolved to kill Simone and Frizi to avenge his half-brother's death. News of Patrizzi's intention, however, reached Simone and Simone's associates.[4] Simone and his associates planned a preemptive strike; Patrizzi would be killed before he killed Simone or Frizi.

For some period of time up to January 26, 1981, Patrizzi had been incarcerated for criminal offenses unrelated to the present case. On January 26, Patrizzi was transferred to a half-way house. While a resident of the half-way house, Patrizzi was "employed" at Surf Auto Body in Revere. At trial, the director of the half-way house testified that Patrizzi's

---

[4]For a discussion of the relationship between the parties, see *United States* v. *Angiulo, supra* at 1176-1177.

transition back into society did not proceed smoothly. He recalled a day in February, 1981, when Patrizzi was visibly upset and carried on in a manner that disturbed the other residents and the staff. In response, the director summoned Patrizzi to a meeting where he attempted to calm Patrizzi. In response to the director's queries, Patrizzi responded, as told by the director, "They killed my brother . . . . I've got to get them." On March 3, 1981, the director listed Patrizzi as being on "escape status."

On March 11, 1981, the FBI intercepted a conversation, which occurred at 98 Prince Street, among the defendant, Samuel Granito, and Simone. The conversation reveals that the defendant knew about Patrizzi's intentions as well as the plot to kill Patrizzi. Granito and Simone told the defendant that they had unsuccessfully attempted to kill Patrizzi on two occasions. Granito and Simone also told the defendant that Patrizzi had been given money, gold, clothing, and a "no-show" job at Surf Auto Body so they would know of his whereabouts. Nonetheless, Patrizzi had disappeared. The defendant expressed his displeasure that the plan to kill Patrizzi had gone awry and demanded an explanation as to how he had eluded them. Later, the defendant affirmed the need to kill Patrizzi.

On March 12, 1981, the FBI intercepted a conversation, which also occurred at 98 Prince Street, between the defendant and another associate, Ilario Zannino. During the conversation, the defendant told Zannino about his conversation with Granito and Simone. The defendant asked Zannino to assist with the Patrizzi "problem." The defendant, having been previously informed that Patrizzi was hiding in the South Boston section of Boston, told Zannino that he would give him Patrizzi's telephone number when he received it. Zannino expressed some concern: he wanted to make sure that he "hit" the right man. Zannino said he knew "what to do" after he acquired Patrizzi's telephone number.

On April 3, 1981, the FBI intercepted a conversation of Zannino and two associates, Ralph Lamattina and Johnny Cincotti. The conversation took place at 51 North Margin

Street. Referring to Patrizzi, Zannino told Lamattina and Cincotti that Patrizzi had been "clipped" and his body put in a trunk. Zannino cautioned the men to keep silent about this development.

On June 11, 1981, Lynn police found Patrizzi's body in the trunk of an automobile. The Lynn police officer who discovered the body testified that Patrizzi had been "hog-tied." Patrizzi's legs were bent from his knees up to his buttocks. A rope was tied around his ankles. It extended up his back and was knotted around his neck. The rope was "fairly" taut. The officer testified that Patrizzi's body was found inside a sleeping bag. Four or five strands of rope were tied around the sleeping bag.

The medical examiner conducted an autopsy on June 13, 1981. He identified Patrizzi's corpse through medical and dental records and reported the cause of death as asphyxia due to strangulation by ligature. Patrizzi had been dead at least two weeks prior to the autopsy. The medical examiner could not determine the exact date or time of death because of the degree of decomposition of the body.

The defendant raises numerous issues on appeal. We consider only those issues that are dispositive or which may recur at a new trial and provide additional facts as necessary.

1. *Jurisdiction and scope of review.* After sentencing, the judge advised the defendant of his right to appeal citing G. L. c. 278, § 28 (1990 ed.). The defendant's appeal originally was entered in the Appeals Court. In his brief, filed in the Appeals Court prior to transfer of the case to this court, the defendant argued that he is entitled to appellate review pursuant to G. L. c. 278, § 33E (1990 ed.). The defendant claims that § 33E applies, notwithstanding his conviction as an accessory before the fact to murder in the first degree, because he is a defendant in a "capital" case,[5] as that term is used in § 33E. The defendant argues § 33E applies because

---

[5]An individual convicted of murder in the first degree is referred to as a "capital" defendant although capital punishment is not a penalty currently recognized by law in the Commonwealth. *Dickerson* v. *Attorney Gen.*, 396 Mass. 740, 741 (1986).

he could have been indicted and tried on the underlying substantive felony, murder in the first degree, see G. L. c. 274, § 3 (1990 ed.), and because he is subject to the same punishment as one who has been convicted of murder in the first degree as a principal, see G. L. c. 274, § 2 (1990 ed.).[6] We agree.

General Laws c. 278, § 33E, vests exclusive appellate jurisdiction in capital cases in this court. The scope of review mandated by § 33E is broader than that available to a defendant in a noncapital case. *Commonwealth* v. *Cullen*, 395 Mass. 225, 228 (1985). If the defendant is a "capital" defendant as the term is used in § 33E, then he is entitled to a standard of review considerably broader than that to which he would otherwise be entitled.

We proceed to consider whether the defendant, convicted as an accessory before the fact to murder in the first degree, is a "capital" defendant as that term is used in G. L. c. 278, § 33E. We begin with the statute. Section 33E defines a capital case as "a case in which the defendant was tried on an indictment for 'murder in the first degree and was convicted of murder in the first degree." Given such a case, the General Court has directed us "to review the 'whole case' to determine whether the verdict is 'against the law or the weight of the evidence.'" *Dickerson* v. *Attorney Gen., supra* at 741, quoting G. L. c. 278, § 33E. On such a finding, the statute empowers us to "'order a new trial or . . . direct the entry of a verdict of a lesser degree of guilt,' if the interests of justice so require." *Id.* at 741-742. As we have stated, the "uniquely thorough review of first degree murder convictions

---

[6]At sentencing the clerk said: "[O]n Indictment 11525, accessory before the fact of murder in the first degree, the jury having returned a verdict of guilty, the Court orders that you be punished by confinement for a term of life . . . ." General Laws c. 265, § 2 (1990 ed.), provides in part: "No person shall be eligible for parole . . . while he is serving a life sentence for murder in the first degree . . . ." As the defendant here was convicted as an accessory before the fact to murder in the first degree, and the punishment for conviction as an accessory before the fact is the same as that for the underlying offense, the defendant's sentence is, unequivocally stated, life imprisonment without possibility of parole.

is warranted by the infamy of the crime and the severity of its consequences." *Id.* at 744. One convicted of murder in the first degree is subject to life imprisonment without the possibility of parole. G. L. c. 265, § 2 (1990 ed.).

We hold that the statute cannot be interpreted reasonably to exclude from its sweep a defendant indicted and convicted as an accessory before the fact to murder in the first degree. General Laws c. 274, § 3, provides, in pertinent part, "Whoever counsels, hires or otherwise procures a felony to be committed may be indicted and convicted as an accessory before the fact . . . or may be indicted and convicted of the substantive felony . . . ." If the Commonwealth prosecuted the defendant for murder in the first degree, as it could have, and a conviction resulted, the defendant would be a capital defendant within the meaning of § 33E. The issue as to the applicability of § 33E in this case arises solely because the Commonwealth opted to prosecute the defendant as an accessory before the fact and not for the substantive offense.

If we were to decide that § 33E applies only to those defendants convicted of murder in the first degree as principals, then the Commonwealth's decision to prosecute the defendant as an accessory rather than for the substantive crime would adversely affect the defendant's appellate rights. It is unlikely that the General Court intended such a construction. Cf. *Commonwealth* v. *Connolly*, 394 Mass. 169, 174 (1985) (court resolves doubts as to statute's meaning in favor of criminal defendant). Moreover, the purposes underlying the need for plenary review under § 33E are no less present in a case where the defendant is charged as an accessory before the fact to murder in the first degree. See G. L. c. 274, § 2 (an accessory before the fact "shall be punished in the manner provided for the punishment of the principal felon"). Finally, we find further support in *Grady* v. *Treasurer of the County of Worcester*, 352 Mass. 702, 704 (1967), where we held that one convicted as an accessory before the fact to murder had committed a capital crime for the purposes of awarding attorney's fees to the defendant's court-appointed counsel.

For these reasons, we conclude that the defendant is a capital defendant within the meaning of G. L. c. 278, § 33E. Accordingly, we consider his appeal in view of the requirements set forth in § 33E.

2. *Grand jury proceedings.* The defendant presses three arguments concerning the validity of the indictment and the conduct of the grand jury proceedings. We consider each argument in turn.

a. *Sufficiency of evidence.* On two occasions prior to trial, the defendant moved to dismiss the indictment on the ground that the grand jury did not receive sufficient evidence to find probable cause. See *Commonwealth* v. *McCarthy*, 385 Mass. 160 (1982). On each occasion, the motion judge, who was not the trial judge, denied the motion. The defendant claims that the motion judge erred. The defendant argues, in essence, that the quantum of evidence introduced to the grand jury was insufficient to support probable cause. Thus, the defendant argues that the indictment was "fatally defective, and all subsequent proceedings taken in reliance upon the indictment were void." *Connor* v. *Commonwealth*, 363 Mass. 572, 574 (1973). We disagree.

In *Commonwealth* v. *McCarthy, supra* at 163, we held that where a grand jury receives no evidence of criminality on the part of the accused, the indictment must be dismissed. In so holding we stated that "at the very least the grand jury must hear sufficient evidence to establish the identity of the accused . . . and probable cause to arrest him. . . ." (Citations omitted.) *Id.* This evidentiary threshold serves to protect the innocent "against unfounded criminal prosecutions." *Lataille* v. *District Court of E. Hampden*, 366 Mass. 525, 532 (1974). See *Commonwealth* v. *McCarthy, supra* at 163 n.6. Otherwise stated, indictment only on probable cause "is justly regarded as one of the securities to the innocent against hasty, malicious and oppressive public prosecutions." *Jones* v. *Robbins*, 8 Gray 329, 344 (1857).

We have reviewed the minutes of the grand jury proceedings. We conclude that the grand jury heard sufficient evidence to warrant a finding of probable cause. See *Common-*

*wealth* v. *O'Dell*, 392 Mass. 445, 450-453 (1984); *Commonwealth* v. *McCarthy*, *supra* at 163. The grand jury had a transcript of tapes which recorded the defendant's conversation with his associates in which there was an abundance of evidence of probable cause to believe that he was an accessory before the fact to murder. There was no error.

b. *The Federal prosecutor.* Mr. Ernest S. DiNisco, an assistant United States attorney, had worked on the Federal government's case against the defendant. DiNisco was familiar with both the videotapes and audio tapes which were the cornerstone of the Federal case. See *United States* v. *Angiulo*, 897 F.2d 1169, 1176 (1st Cir.), cert. denied, 498 U.S. 845 (1990). As the Commonwealth's case rested on some of the same recordings, the Commonwealth enlisted DiNisco's assistance to facilitate presentation of its case to the grand jury.

At some point prior to trial, DiNisco was appointed and sworn as a special assistant district attorney. The date of DiNisco's appointment is not clear from the record. The assistant district attorney informed the judge that DiNisco had been sworn prior to presentation of the evidence to the grand jury. Documentary evidence, in the form of a notice of appointment, indicates that DiNisco's appointment was effective April 17, 1987, a date after the grand jury had adjourned. The notice of appointment limited the scope of DiNisco's responsibility to the prosecution of Gennaro Angiulo, Ilario Zannino, Frederick Simone, and Samuel Granito.

The grand jury convened on December 3, 1986. The assistant district attorney spoke first: "Good morning, members of the Grand Jury. For the record . . . I'm an Assistant District Attorney here in Essex County. And aiding me in the presentation of this investigation is Special Assistant District Attorney Ernest DiNisco, who is also a special attorney with the Justice Department." The grand jury heard testimony from two witnesses. The assistant district attorney questioned the first witness. DiNisco questioned the second witness. Based on the testimony, the grand jury indicted the defendant.

The defendant argues that DiNisco's presence was unauthorized and, therefore, his indictment is void and his conviction must be overturned. We disagree.

In *Commonwealth v. Pezzano*, 387 Mass. 69, 72-73 (1982), we stated that "the presence of an unauthorized person before a grand jury will void an indictment. . . . Th[e] principle is based 'upon the fundamental conception that proceedings before the grand jury must be in secret.' . . . This rule of secrecy imposed on the hearings and deliberations of the grand jury derives from two significant considerations. The first is a decision to 'save individuals from notoriety unless probable cause is found against them and an indictment is returned and disclosed. . . . The second . . . is to shield grand jury proceedings from any outside influences having the potential to 'distort their investigatory or accusatory functions. . . .'" (Citations omitted.) See *Commonwealth v. Conefrey*, 410 Mass. 1, 5-8 (1991).

Rule 5 (c) of the Massachusetts Rules of Criminal Procedure, 378 Mass. 850 (1979), provides: "Attorneys for the Commonwealth who are necessary or convenient to the presentation of the evidence, the witness under examination, the attorney for the witness, *and such other persons who are necessary or convenient to the presentation of the evidence may be present* while the grand jury is in session" (emphasis supplied).

Conflicting evidence exists in the record concerning the timing of Mr. DiNisco's appointment as a special assistant district attorney. Thus, we shall assume that his appointment was not effective at the time of the grand jury proceedings. See *Commonwealth v. Parker*, 402 Mass. 333, 342 (1988). Nonetheless, DiNisco's presence is permitted under rule 5 (c) as a person "necessary or convenient" to the presentation of evidence. Additionally, the defendant has failed to direct us to evidence tending to support the conclusion that DiNisco's presence compromised the truth-seeking function of the grand jury proceedings. Our review of the minutes of the grand jury proceeding has revealed no such evidence.

The defendant also argues that DiNisco should not have participated in the grand jury presentation because he was, at all relevant times, an assistant United States attorney. The defendant claims that DiNisco's presence served to taint the grand jury proceedings because DiNisco owed his allegiance to a "different sovereign" — the Federal government. The defendant argues that the responsibility to press a criminal indictment belongs only in the hands of officers of this Commonwealth who are agents of the people. See art. 5 of the Massachusetts Declaration of Rights.

The defendant's argument erroneously assumes that DiNisco, and not an agent of the people of the Commonwealth, controlled the presentation of the evidence in defendant's case to the grand jury. It is clear from the minutes of the proceedings that DiNisco's role was to assist and to aid the chief prosecutor because of his familiarity with the evidence. At no point can it fairly be said that DiNisco directed or controlled the grand jury presentation. See *Commonwealth* v. *Beneficial Fin. Co.*, 360 Mass. 188, 205-206 (1971), cert. denied sub nom. *Farrell* v. *Massachusetts*, 407 U.S. 910, and sub nom. *Beneficial Fin. Co.* v. *Massachusetts*, 407 U.S. 914 (1972). So long as control of the case remained with a duly authorized member of the executive branch, here the assistant district attorney, and absent a showing of prejudice or manifest injustice resulting from DiNisco's participation, his participation was permissible. This result would be no different if DiNisco was in fact simultaneously serving as assistant United States attorney and as special assistant district attorney.

c. *The tape recordings.* The grand jurors did not hear the tape recording the FBI produced during its surveillance. Rather, an FBI agent, who had identified the voices on the recordings and prepared a transcript, read portions of the transcript to the grand jury. The FBI agent testified that the transcript fairly and accurately represented the words spoken on the recordings. The FBI agent also testified that inaudible portions of the recordings were so designated in the transcript.

The defendant asserts that the judge erred in denying the motion to dismiss the indictment due to the Commonwealth's failure to inform the grand jurors of the "degraded" quality of the tape recordings or to play them for the grand jurors. The defendant asserts that this failure served to impair the integrity of the grand jury proceedings. See *Commonwealth v. O'Dell, supra.* We disagree.

In *Commonwealth v. Mayfield*, 398 Mass. 615, 620 (1986), we stated: "In certain instances, the failure to disclose known information may impair the grand jury proceedings. For example, presentation of a defendant's inculpatory statements recorded in a police report, distorted by the intentional failure to disclose the defendant's exculpatory comments interspersed in that report, impaired grand jury proceedings and required dismissal of the indictment in *Commonwealth v. O'Dell*, 392 Mass. 445, 448-449 (1984)." We went on to say: "To sustain a claim that the integrity of the grand jury proceeding has been impaired, not only must the evidence have been given with the knowledge that it was false or deceptive, but the false or deceptive evidence must probably have been significant in the view of the grand jury and must have been presented with the intention of obtaining an indictment." *Mayfield, supra* at 621. See *id.* at 637 (Liacos, J., dissenting).

Such is not the case here. Assuming, arguendo, that the Commonwealth intentionally withheld the disputed information,[7] the defendant has not shown that this information would have been significant in the view of the grand jury. The absence of additional information concerning the quality of the recordings did not tend to distort the incriminating nature of the evidence the grand jury had before them. Compare *Commonwealth v. O'Dell, supra* at 449. The integrity of the grand jury proceedings was not impaired.

3. *Change of venue.* On three occasions prior to trial, the defendant moved for a change in venue. On appeal, the de-

---

[7]This point is disputable. The FBI agent testified that portions of the recorded conversation were "not completely intelligible."

fendant urges us to hold that the denial of these motions rendered nugatory his constitutional right to an impartial jury trial. The defendant argues that the prejudice of the jury should be presumed because such a high percentage of the members of the venire were disqualified due to their "knowledge" of the defendant.[8] As such a high percentage of the venire members demonstrated a disqualifying prejudice, defendant argues, the reliability of the claims of impartiality of the empaneled jurors should be drawn into question. There was no error in the rulings on this point.

We begin by noting that "a change in the place of trial . . . should be ordered with 'great caution and only after a solid foundation of fact has been first established.' " *Commonwealth* v. *Bonomi*, 335 Mass. 327, 333 (1957), quoting *Crocker* v. *Superior Court*, 208 Mass. 162, 180 (1911). "The existence of pretrial publicity does not alone indicate that an impartial jury cannot be empanelled." *Commonwealth* v. *Jackson*, 388 Mass. 98, 108 (1983), citing *Dobbert* v. *Florida*, 432 U.S. 282, 302-303 (1977). The question, properly framed, is "whether there are 'any indications in the totality of the circumstances that [the defendant's] trial was not fundamentally fair.' " *Commonwealth* v. *Jackson, supra* at 109, quoting *Murphy* v. *Florida*, 421 U.S. 794, 799 (1975).

The defendant advances an argument in which he urges us to presume prejudice in the venire because forty-two per cent of the venire was excused. We decline the defendant's invitation to attribute the prejudice of some to the otherwise impartial jurors. Review of the transcript reveals no rational basis for such a conclusion. We note that, while forty-seven persons were disqualified due to their "knowledge" of the defendant, the source of the knowledge was not common.

For example, one prospective juror was excused because he was related by marriage. Prospective jurors were excused be-

---

[8]The defendant bases his argument on the "fact" that "[f]orty-two percent [forty-seven out of 112] of the jurors who were inquired of by the trial court had to be disqualified because of their knowledge about the defendant."

cause a family member had attended school with the defendant's child or knew of him. A prospective juror was excused because she knew a person who was a police officer and doubted her ability to consider, on an equal footing, testimony offered to rebut that of a police officer. One prospective juror was excused because he felt that the victim got what he deserved, while another was excused because he could not have convicted the defendant. Some prospective jurors had learned of the defendant not from recent publicity but from parents or friends, and were thereby predisposed.

Given the varied reasons for the partiality we cannot say that the raw number of disqualifications, in itself, causes us to question the impartiality of the qualified jurors. It is clear from the totality of the circumstances that the defendant's right to a fair trial was not compromised due to the judge's failure to grant the defendant's motion for a change in venue. The defendant has fallen far short of meeting his burden of showing that he was "generally and substantially prejudged" such that "it was practically impossible to empanel an impartial jury." *Commonwealth* v. *Bonomi, supra* at 333.

4. *The Massachusetts wiretap statute.* The defendant argues that the judge erred in failing to suppress[9] the fruits of the Federal surveillance because he was not served with a complete copy of all the recordings thirty days prior to trial pursuant to G. L. c. 272, § 99 O 1 (1990 ed.) (discovery provision). Section 99 O 1 provides in pertinent part: "[I]n any criminal trial where the commonwealth intends to offer in evidence any portions of the contents of any interception or any evidence derived therefrom the defendant shall be served with a complete copy of each document and item which make up each application, renewal application, warrant, renewal order, and return pursuant to which the information was obtained." If the defendant is not served with the

---

[9]While the defendant treats the issue as a matter of "discovery," we note that failure to give discovery as required by § 99 O 1 is a ground for suppression under § 99 O & P. Thus, we treat the matter as one involving suppression of evidence.

specified document and items, the intercepted communication and any evidence derived therefrom are rendered illegally obtained and are inadmissible. G. L. c. 272, § 99 P 1.

The defendant does not dispute that thirty days prior to trial he received copies of all the tapes the Commonwealth intended to use as evidence against him. Rather, the defendant argues that he is entitled to receive *all* the recordings made during the Federal surveillance as a condition precedent to the admission in evidence of any portion of the recordings. The defendant argues that § 99 O 1 applies to the surveillance conducted by the Federal government.

While we reserved our opinion on a similar issue in *Commonwealth* v. *Picardi*, 401 Mass. 1008 (1988), we now consider whether the discovery provision of the wiretap statute is applicable to interceptions made by the Federal government, authorized by order of a Federal court. We are persuaded that § 99 O 1 does not apply to such evidence. We interpret § 99 O 1 to apply only to evidence obtained pursuant to the application, warrant, renewal application, and return provisions of G. L. c. 272, § 99 F-M. Our conclusion follows from the statute which provides, "[T]he defendant shall be served with a complete copy of each document and item which make up each *application, renewal application, warrant, renewal order, and return*" (emphasis supplied). G. L. c. 272, § 99 O 1.

As the General Court defined each of the emphasized terms in c. 272, § 99 F-M, we assign the definition of each of the emphasized terms to § 99 O 1.[10] Thus, defendant is entitled to documents and items which comprise each application, renewal application, warrant, and return filed, issued, or requested pursuant to G. L. c. 272, § 99 F-M. As the

---

[10]For example, § 99 F 1 provides: "1. Application. The attorney general, any assistant attorney general specially designated by the attorney general, any district attorney, or any assistant district attorney specially designated by the district attorney may apply ex parte to a judge of competent jurisdiction for a warrant to intercept wire or oral communications." A judge of competent jurisdiction is defined as "any justice of the superior court of the commonwealth." G. L. c. 272, § 99 B 9.

application in the present case was submitted, the warrant issued, the renewal granted, and return made pursuant to Federal law, it necessarily follows that the discovery provisions of the statute do not apply.[11] See *District Attorney for the Plymouth Dist.* v. *Coffey*, 386 Mass. 218, 224-225 (1982). As the recordings were lawfully obtained under Federal law, we know of no basis under the statute which would entitle the defendant the automatic right to discover copies of *all* the recordings made during the Federal surveillance in circumstances where he had received discovery of all recordings which were to be offered in evidence. Accordingly, we find no error.

*5. The admissibility of Zannino's statements of April 3, 1981.* During the trial, the Commonwealth presented evidence, in the form of a tape recording, of a conversation Ilario Zannino had with two associates on April 3, 1981. The essence of the conversation, drawn from the transcript of grand jury proceedings is presented in the margin.[12] The defendant objected to Zannino's statements as hearsay. The judge admitted Zannino's statements as statements made by a joint venturer in furtherance of a joint enterprise. There was no error.

In *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 543 (1990), quoting *Commonwealth* v. *White*, 370 Mass. 703, 708-709 (1976), we stated the well-settled rule that "out-of-

---

[11]However, the defendant's rights of discovery under Mass. R. Crim. P. 14, 378 Mass. 874 (1979), remain applicable. We note also that there is no indication that Federal authorities were acting in collusion with or as agents of State law enforcement authorities in obtaining the recording. See *District Attorney for the Plymouth Dist.* v. *Coffey*, 386 Mass. 218, 222 (1982). See also *id.* at 226, 229 (Liacos, J., concurring).

| [12]ILARIO ZANNINO: | "Shh. Now shh. Johnny I told you didn't I." |
| JOHN CINCOTTI: | "Yeah." |
| ILARIO ZANNINO: | "About Joe Porter's brother [Angelo Patrizzi]?" |
| JOHN CINCOTTI: | "No." |
| ILARIO ZANNINO: | "Well they clipped him . . . ." |
| RALPH LAMATTINA: | "Oh, that's it." |
| ILARIO ZANNINO: | "Don't say a fuckin word now." |
| JOHN CINCOTTI: | "Did they find him?" |

court statements by joint criminal venturers are admissible against the others if the statements are made 'both during the pendency of the cooperative effort and in furtherance of its goal.' " This exception does not apply after the criminal enterprise has ended, see *Commonwealth* v. *Drew*, 397 Mass. 65, 71 (1986), but does apply where the joint venturers are acting to conceal the crime that formed the basis of the enterprise. See *Commonwealth* v. *White, supra* at 709-710 & n.8.

The defendant contends that the joint venture had ended at the time Zannino made the statements in issue. On this basis, the defendant argues that Zannino's statements are unreliable hearsay. See *Commonwealth* v. *Bongarzone,* 390 Mass. 326, 340 (1983) (reliability derives from continuation of joint enterprise).

Efforts on the part of a joint venturer to conceal the occurrence of the enterprise's unlawful purpose or to effect an escape warrant the inference that the joint venture continued through the time the statements were made. *Commonwealth* v. *White, supra* at 709-710. Absent a circumstance such as where the declarant had been incarcerated at the time the statement was made, as was the case in *Commonwealth* v. *Drew, supra* at 71, or where the declarant has been apprehended before the statement had been made, as was the case

| ILARIO ZANNINO: | "No, they didn't find him. They put him in his trunk. . . . Nine of them. They lugged him from the fuckin Topcoat. Nine fuckin guys. . . . He went in for a top coat. And nine of them did it. Sonny did. Sonny Boy. You know all the fuckin trouble makers. And he's in his trunk. . . . [T]he super Boss had told me on the QT. Jerry [Angiulo] says, 'I gotta tell you something . . . .' 'They clipped Joe Porter's brother. . . .' 'Larry [Zannino], listen to me now.' 'Listen what?' He says, 'got him in his fuckin trunk.' " |
|---|---|
| RALPH LAMATTINA: | "It's been ten days." |
| ILARIO ZANNINO: | "But they got him. They got him. Freddy [Simone] was scared to death. The kid [Patrizzi] would have clipped him in two fuckin minutes." |
| RALPH LAMATTINA: | "He wanted to clip Freddy. The kid wanted to ahh." |

in *Commonwealth* v. *Dahlstrom*, 345 Mass. 130, 132 (1962), we cannot say that the joint venture had terminated at the time the statements were made. The relationship of the defendant and the declarant as revealed through conversations intercepted on March 12, 1981, and the circumstances in which the statements at issue were made, give us little difficulty concluding that the judge was within his discretion in ruling that there was "[a]n adequate probability of the existence of . . . [a continuing] common venture . . . ." *Commonwealth* v. *Bongarzone, supra* at 340.

The defendant argues that Zannino made the statements only to boast or brag of the incident. The defendant's argument that Zannino's discourse was nothing more than bragging is untenable. The defendant and Zannino had previously discussed the "problem" that Patrizzi was causing them. Zannino stated he knew "what to do" on receipt of information revealing Patrizzi's whereabouts. At an unknown point in time Patrizzi was killed. The defendant will not be heard to say that Zannino was not attempting to limit the flow of information concerning a situation he had previously discussed and which remained undiscovered at the time he made the statements in issue. Zannino's statements may have been boastful but in this instance the boast masked a desire to conceal the fact of the killing and the identity of the killers. As this end served to benefit both Zannino and the defendant, this overlap of interests "tends in some degree to assure" that Zannino's statements are minimally reliable. *Id.* Accordingly, there was no error.

6. *Anonymous jury.* We come now to the two interrelated errors committed at trial which require us to conclude that we must reverse the conviction and order a new trial. These errors involve the use of an anonymous jury, and, as will be explained, were compounded by the conduct of an examination by the trial judge of some members of the jury during the course of the trial in the absence of the prosecutor, defense counsel, and the defendant. The relevant facts pertaining to the empanelment of an anonymous jury are these.

Prior to summoning the venire, the Commonwealth moved for empanelment of an anonymous jury. The Commonwealth argued that an anonymous jury was necessary as a precautionary measure "to insure that the jurors are free from intimidation, threats, or corrupt attempts to influence or purchase their votes." The Commonwealth, however, did not seek to sequester the jury. Without written opinion, the motion judge granted the motion over the defendant's objection.[13]

At the outset, the judge adopted the Commonwealth's suggestion that jurors not be told of their anonymity to avoid the possibility that they would draw any adverse inference against the defendant. Thus, he gave no instruction to the jurors to draw no inference adverse to the defendant from the fact (then unknown to the jurors) of their anonymity. The judge did, however, authorize all prospective jurors to complete a six-page questionnaire pertaining to their background.[14] Both parties used the responses to these questions to frame their voir dire inquiry and to exercise peremptory challenges. During voir dire the judge questioned each prospective juror and permitted both the Commonwealth and defense counsel an opportunity for further questioning.

---

[13]Counsel renewed his objection immediately after the judge granted the Commonwealth's motion, and stated: "I just want to make certain, again on the record, in lieu of and in view of the Court's motion, I ask the Court to reconsider and to sequester the jurors instead of taking away the right of a defendant to know the name and address for all the reasons I've heretofore stated." The judge replied: "That is not entirely out of my mind. But, just so there's a record of it, it's denied at the moment until I get a feeling as to what issues are going to be presented once I start talking with these jurors." Counsel objected again to anonymity during jury selection, pointing out that this practice prevented him from exercising fully-informed challenges with respect to a juror whose son worked for a district attorney's office and to a juror whose husband was a police officer. The defendant, therefore, preserved his right to appeal the allowance of the Commonwealth's motion to withhold the jurors' names and addresses. See J.R. Nolan, Appellate Procedure 3-4, § 5 (1991).

[14]Under the proposed scenario, each juror was identified by alphanumeric designation. Each juror's name, address, and place of employment were concealed.

During the course of the trial, a court officer reported to the judge that several jurors had complained that the defendant was giving them the "whammy" or "evil eye."[15] Some of the jurors said they felt intimidated by the defendant and believed that he was writing down information about them. In response to this occurrence the judge interviewed each juror in chambers after discussing the matter with counsel. The purpose of the interviews was to learn of the reported conduct and assess the impartiality of the jurors. Each juror was interviewed individually. Neither the defense counsel nor the prosecutor was present during the interviews. The court stenographer was present during each interview and a transcript of the proceedings was made available to counsel immediately after the interviews.

During the course of the interviews, the judge discussed the alleged incident and told the jurors that he often sees defendants writing notes during trial and that the defendant's actions could be explained given his interest in the proceedings. The judge also told most of the jurors that their identities were concealed as a matter of standard operating procedure in the Superior Court.[16] The judge concluded each interview after determining that the juror being interviewed remained impartial given the circumstances. After concluding the interviews the judge reported to counsel that the matter was of "no consequence."

---

[15]One juror described the incident as follows: "What happened, your Honor, was, what I seen was [the defendant] looking up at the jury, okay, looking back down, making like — I don't know if he was writing anything or not. But he was making like he was writing anything and talking to himself. He would look up again at the jury. I don't know if he was looking — looked like he was looking at every one of us individually and doing that same thing, up and down, up and down."

[16]For example, the judge told a juror, "I'm going to tell you because it came up with another juror. In the Superior Court the only place . . . your name appears is in the clerk's office. And it is possible to take a number from here and go down and match it in Salem at the clerk's office and retrieve a juror's name. But it's not an easy thing to do and they're not going to be made public. So I tell you that, simply because if I were a juror, I would want, perhaps to know that."

The judge did not inform three jurors of their anonymity.

The defendant argues that the judge erred in granting the Commonwealth's motion to empanel an anonymous jury. The defendant's argument has three aspects. First, the defendant argues that empaneling an anonymous jury tainted the presumption of innocence, thereby infringing on his due process right to a fair trial. Second, the defendant argues that the complained-of procedure impaired his right to exercise his peremptory challenges, thereby infringing on his right to an impartial jury. Third, the defendant argues that the use of an anonymous jury violated G. L. c. 277, § 66 (1990 ed.),[17] which provides: "A prisoner indicted for a crime punishable

[17]We disagree with the dissent's claim that the defendant's appellate brief did not properly present his statutory challenge to jurors' anonymity. *Post* at 532-533. The defendant's argument was straightforward: he argues in his brief that, by its plain terms, G. L. c. 277, § 66 (1990 ed.), entitled him to a list of prospective jurors. "A brief should be no longer than is necessary to convince and persuade the panel of the position taken and a request for relief . . . An attorney should not prejudice his case by being prolix. He should make his points and conclude. Conciseness creates a favorable context and mood for the appellate judges." J.R. Nolan, Appellate Procedure, *supra* at 11, § 24. The defendant's brief, which raised numerous claims of error, was generally concise and terse. The entire section on jurors' anonymity spanned approximately two pages. The heading of the section indicated that the defendant would argue both constitutional and statutory violations. After describing the relevant facts, the body of the section devoted about two and one-half paragraphs to legal arguments. One paragraph argued that jurors' anonymity is constitutionally prohibited when it creates an unreasonable burden on the presumption of innocence, and cited to a seminal case addressing this issue. In another paragraph, the defendant's brief addressed the issue of peremptory challenges and presented the uncomplicated argument that § 66 — which the defendant reproduced in an addendum — "requires that the list of potential jurors be made available to the defendant." Finally, a concluding paragraph stated that the "process employed here violated our statutory scheme and the defendant's state and federal constitutional rights to a fair jury trial and the presumption of innocence."

In this context, it is clear that the defendant made more than a mere passing reference to his statutory argument. Cf. *Karen Constr. Co.* v. *Lizotte*, 396 Mass. 143, 148 n.7 (1985). In spite of the compressed style of his appellate brief, the defendant properly presented his "contentions . . . and the reasons therefor, with citations to the authorities, statutes and parts of the record relied on." Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975). It is our duty to address the defendant's claim notwithstanding the Commonwealth's failure to respond to it. See *Merrimack Mut. Fire Ins. Co.* v. *Nonaka*, 414 Mass. 187, 191 (1993) (principle of law

with death or imprisonment for life, upon demand by him or his counsel upon the clerk, shall have a list of the jurors who have been returned. . . ."[18] We agree that the defendant, charged as an accessory before the fact to murder in the first degree and punishable with life imprisonment without the possibility of parole, is a member of the class to whom the subject statute is addressed. The Commonwealth has cited no other capital cases in the nation where the defendant stood trial in front of an anonymous jury, and we have been unable to locate any. The Federal courts that have approved the use of an anonymous jury have expressly noted that "in capital cases, the law requires the disclosure of the names and addresses of prospective jurors . . . before trial. See 18 U.S.C. § 3432." *United States* v. *Scarfo*, 850 F.2d 1015, 1023 (3d Cir.), cert. denied, 488 U.S. 910 (1988). In the Commonwealth, this rule is embodied in G. L. c. 277, § 66.

We conclude that the words "list of the jurors" in § 66 include prospective jurors' names and addresses for several reasons. First, such construction accords with the plain meaning of these words. Next, the history of § 66 reveals that its drafters intended that jurors' names be given to defendants in capital cases. Like its Federal counterpart — 18 U.S.C. § 3432 (1988) — § 66 is derived from the English practice of providing a list of jurors to the defendants in certain capital cases. *Commonwealth* v. *Allen*, 379 Mass. 564, 575 & n.4 (1980). In turn, this English practice was codified in a statute expressly requiring that these defendants receive "a list of the witnesses that shall be produced on the trial for proving the . . . indictment, and of the jury, mentioning the *names, profession, and place of abode of the said witnesses and jurors*" (emphasis added). *Logan* v. *United States*, 144

---

argued by litigant but not addressed in opponent's brief dispositive of case).

[18]The United States Code contains a similar statute which provides, in pertinent part: "A person charged with treason or other capital offense shall . . . be furnished with a . . . list of the veniremen . . . stating the place of abode of each venireman . . . ." 18 U.S.C. § 3432 (1988).

U.S. 263, 305 (1892), quoting the statute of 7 Anne, c. 21, § 11.

Moreover, under established principles of statutory construction, we presume that the Legislature does not intend "to enact a barren and ineffective provision." *Insurance Rating Bd.* v. *Commissioner of Ins.*, 356 Mass. 184, 189 (1969). See *O'Shea* v. *Holyoke*, 345 Mass. 175, 179 (1962). To conclude that the information given to the defendant at trial was sufficient to comply with the mandate of § 66 would render this statute a virtual nullity because of the common law rule which is an inherent part of the law governing jury challenges. "Concomitant to the use of both peremptory challenges and challenges for cause must be the implied right to use reasonable means to gather information which will aid the parties in the intelligent exercise of challenges toward the constitutionally mandated goal of a fair and impartial jury." *Commonwealth* v. *Allen, supra* at 577. See *United States* v. *Barnes*, 604 F.2d 121, 142 (2d Cir. 1979), cert. denied, 446 U.S. 907 (1980), citing *Swain* v. *Alabama*, 380 U.S. 202 (1965) ("A criminal defendant is entitled, under the law, to a fair and impartial jury. To be sure, there must be sufficient information elicited on *voir dire* to permit a defendant to intelligently exercise not only his challenges for cause, but also his peremptory challenges, the right to which has been specifically acknowledged by the Supreme Court . . .").

There appears no doubt that the drafters of § 66 intended to give defendants charged with crimes punishable by death or imprisonment for life, or their counsel, the additional right to obtain the names and addresses of those who would sit in their judgment. The facts of the present case readily illustrate the rationale for this rule: trial counsel has complained that he was unable to determine whether he had had previous encounters with the son of a prospective juror who worked for the district attorney's office, and with the husband of a prospective juror who worked as a police officer. While compelling reasons might justify withholding this information in other contexts, § 66 clearly mandates that the extreme nature of the punishment meted out in such cases

warrants the disclosure of the names and addresses of the jurors.[19]

Like its Federal counterpart, § 66 "is mandatory . . . and failure to allow defendant its benefits [is] plain error." *United States* v. *Crowell*, 442 F.2d 346, 348 (5th Cir. 1971). See *Logan, supra* at 304 ("the words of the existing statute are too plain to be misunderstood").[20]

Although the judge's failure to follow the mandate of § 66 requires the reversal of the defendant's conviction, we nonetheless discuss the defendant's constitutional claims primarily because we deem it appropriate to outline the circumstances in which a trial judge may allow the empanelment of an anonymous jury. The need to give trial judges guidance in the future in regard to crimes not involving life imprisonment warrants this discussion. Thus, we address also the trial judge's failure to handle the anonymous jury issue in accordance with the mandates of Federal constitutional law.

The Fourteenth Amendment to the United States Constitution embodies the notion, reaching back to Roman law, that a "shield of innocence surrounds a defendant on trial." *United States* v. *Thomas*, 757 F.2d 1359, 1363, cert. denied sub nom. *Fisher* v. *United States*, 474 U.S. 819 (1985), citing *Coffin* v. *United States*, 156 U.S. 432, 453-454 (1895).

---

[19]In a colloquy with the trial judge, trial counsel and the district attorney discussed the possibility that jurors' names and addresses be given only to the parties' attorneys. This practice would have complied with the mandate of § 66 — it would have allowed defense counsel to exercise jury challenges with the knowledge of the jurors' names and addresses — while protecting the jurors' safety.

[20]We disagree with the dissent's argument that reversal of the defendant's conviction is not warranted because the defendant did not make a demand for a list of jurors. *Post* at 533-534. The dissent overlooks the fact that the judge granted the Commonwealth's motion to withhold the jurors' names, thereby making it futile — and indeed highly improper — for the defendant to request a list of prospective jurors from the clerk. The law traditionally does not require litigants to make a futile demand in order to preserve their rights. Cf. *Pupecki* v. *James Madison Corp.*, 376 Mass. 212, 218 (1978) (shareholder's demand that corporation itself bring suit is prerequisite to shareholder's derivative suit unless such demand would be futile).

This so-called "presumption of innocence" is "a basic component of a fair trial under our system of criminal justice." *Estelle* v. *Williams*, 425 U.S. 501, 503 (1976). In *Estelle*, the Supreme Court of the United States held that a State may not — consistent with the presumption of innocence — create trial conditions that affect the jurors' perception of the defendant unless there is a substantial government interest in doing so. *Id.* at 505.

The empanelment of an anonymous jury triggers due process scrutiny because this practice is likely to taint the jurors' opinion of the defendant, thereby burdening the presumption of innocence. *Thomas, supra* at 1364. See *United States* v. *Vario*, 943 F.2d 236, 239 (2d Cir. 1991), cert. denied, 112 S. Ct. 882 (1992); *United States* v. *Tutino*, 883 F.2d 1125, 1132 (2d Cir. 1989), cert. denied, 493 U.S. 1081 (1990); *United States* v. *Scarfo*, 850 F.2d 1015, 1023-1025 (3d Cir. 1988). The due process clause precludes the empanelment of an anonymous jury at a criminal trial unless anonymity is necessary to protect the jurors from harm or improper influence. See *Thomas, supra* at 1365. Henceforth, we shall require that no anonymous jury is to be empaneled in the courts of the Commonwealth unless the trial judge has first determined on adequate evidence that anonymity is truly necessary and has made written findings on the question. Further, the due process clause requires that reasonable precautions be taken to minimize the effect of the jurors' anonymity on their perception of the defendant. *Id.* See *Scarfo, supra* at 1025.[21]

---

[21]The dissent misconstrues the Federal decisions dealing with juror anonymity. These decisions do not stand for the proposition that, in every individual case, the court must balance "the government's interest in safeguarding jurors and preserving the integrity of the judicial process with the defendant's interest in avoiding erosion of the presumption of innocence." *Post* at 535. Rather, the Federal courts have used a method known in the law as "definitional balancing," whereby a seminal decision — such as *United States* v. *Thomas*, 757 F.2d 1359 (2d Cir.), cert. denied sub nom. *Fisher* v. *United States*, 474 U.S. 819 (1985) — articulates a substantive rule which itself strikes the desired balance between the competing interests at stake. See Nimmer, The Right to Speak from Times to Time: First Amendment Theory Applied to Libel and Misapplied to Privacy, 56 Cal.

Federal appellate courts have upheld various methods of minimizing the effect of anonymity on the jurors' minds. Some trial judges chose to conceal the security reasons that prompted the court to withhold the jurors' names. One trial judge, for instance, told the jurors that they would remain anonymous so as to prevent the media from interfering with their privacy. *Thomas, supra* at 1365 n.1. Other judges thought it best to reveal to the jurors that their anonymity was designed to protect them and their families from the possibility of harm or improper influence. These judges, however, added extensive instructions calculated to impress upon the jurors that no inference should be drawn with respect to the culpability of the defendant. See, e.g., *Scarfo, supra* at 1026-1028. No comparable curative instructions were given to the jury in this case at any time.

Under due process principles, if jurors become aware of their anonymity — as happened in the present case — the judge must take affirmative measures to protect the due process rights of the accused. The judge did not mention anonymity until certain jurors complained that the defendant was "giving them the evil eye." At that time, the judge conducted individual conferences with the jurors.[22] In the course

---

L. Rev. 935, 942 (1968). See also Aleinikoff, Constitutional Law in the Age of Balancing, 96 Yale L.J. 943, 948 (1987). This rule may be applied in subsequent cases without additional balancing. *Id.*

Drawing on the competing interests which the dissent describes, the Federal courts clearly have set forth the substantive rule of constitutional law governing juror anonymity: First, the trial judge must make a finding of necessity (which was not made in the present case). Next, the trial judge must take reasonable precautions to minimize the burden on the presumption of innocence occasioned by jurors' anonymity (which, as the text of this opinion describes, the judge failed to do). See *Thomas, supra* at 1365. For cases applying this rule without additional balancing, see, e.g., *United States* v. *Vario,* 943 F.2d 236, 239 (2d Cir. 1991), cert. denied, 502 U.S. 1036 (1992); *United States* v. *Tutino,* 883 F.2d 1125, 1132 (2d Cir. 1989), cert. denied, 493 U.S. 1081 (1990).

[22]We note that the judge never made a finding that the defendant actually attempted to intimidate the jurors by making eye contact with them. In a colloquy that preceded the individual conferences, the judge explained that a television set in the courtroom prevented his observing the defendant. Defense counsel indicated that he did not notice the defendant "in any

of these conferences, some of the jurors indicated that they already knew that their names had been withheld. On hearing this information, the judge did not inquire into the source of the jurors' knowledge. Specifically, the judge did not attempt to ascertain whether the jurors had heard of their anonymity through the numerous newspaper reports that surrounded the trial.[23] If that were the case, the jurors were likely to have been aware of the actual reason for their anonymity. They would, then, have inferred that the judge attempted to hide his belief that the defendant posed a threat to their safety when he made the (inaccurate) statement that anonymity is standard procedure. On these facts, it is evident that the judge did not handle the issue of the jurors' anonymity with the reasonable care required by the due process clause.[24]

---

untoward way making any kind of views around the courtroom to the jury or anyone else." Counsel also suggested that his associate be asked to state for the record whether he had observed any such incident.

The judge, however, rejected this offer. The judge stated that he would order the removal of the television set and tell the defendant that, "any askew looks and I'll have his head." The judge explained that he would assuage the jurors' fears by telling them that most defendants write down notes during their trial, but that such notes could not contain jurors' names because anonymity is the standard procedure. The defendant objected to telling the jurors of their anonymity and moved for a mistrial. The defendant also suggested that the judge delay any action until the prosecutor could review a case on jurors' anonymity which the prosecutor said contained potentially helpful curative instructions. The judge replied, "Well, he's not going to tell you too much." The judge then denied the defendant's motion for a mistrial, denied the defendant's request that he be present during the individual conferences, and stated that he would provide a transcript of these proceedings so that any errors could be corrected.

[23] We note that, in the course of jury empanelment, a prospective juror disclosed that she and other members of her panel had discussed an article that appeared in the Salem News. Trial counsel informed the judge that this article appeared on the front page of the newspaper and reported that an anonymous jury would be empaneled in order to prevent threats to jurors and their families. Counsel requested that the judge determine whether the panel members knew of their anonymity, but the judge denied this request.

[24] These facts also underscore the need for trial judges to give carefully designed instructions relative to jurors' anonymity both at the start of trial

Last, we hold that the judge also erred when he barred the defendant and his counsel from the voir dire that followed the "whammy" incident, thereby compounding the prejudice caused by the mishandling of the anonymous jury issue.[25] "When a judge conducts an inquiry about a consequential matter, such as alleged serious misconduct of jurors, there is a requirement, deriving from the constitutional right of confrontation, that the defendant and his counsel be present." *Commonwealth* v. *Bobilin,* 25 Mass. App. Ct. 410, 415 (1988), citing *Commonwealth* v. *Robichaud,* 358 Mass. 300, 301-303 (1970); *Commonwealth* v. *Connor,* 392 Mass. 838, 843 n.1 (1984); *Commonwealth* v. *Doucette,* 22 Mass. App. Ct. 659, 663-664 (1986), S.C., 400 Mass. 1005 (1987).[26] While the trial judge may perform minor administrative formalities outside the presence of the defendant, see *Commonwealth* v. *MacDonald (No. 1),* 368 Mass. 395, 399 n.3 (1975), the judge may not bar the defendant from a voir dire during which jurors' impartiality may be discussed. *Robichaud, supra* at 303.[27] In the present case, the voir dire

---

and as a part of their instructions. See, e.g., *Scarfo, supra* at 1026-1028. Moreover, it should be noted that in both *Thomas* and *Scarfo,* cases which did not involve a capital offense and on which the dissent relies heavily, the jurors were sequestered at the outset of trial. The jury in this case were not sequestered. In light of these differences, the judge's failure to make a finding of necessity — which was made both in *Scarfo* and in *Thomas* — is not a factor to be glossed over.

[25]The failure to allow the defendant to attend a proceeding in which the judge inquires into a consequential matter is not reversible error per se. See *Commonwealth* v. *Martino,* 412 Mass. 267, 287 n.14 (1992), and cases cited. We disagree with the dissent's contention that we obfuscate the issue whether the erroneous exclusion of the defendant from the voir dire proceedings in the present case constitutes by itself reversible error. *Post* at 540-541. We clearly hold that such error merely *compounded* the prejudicial effect of the due process violations caused by the lack of care with which the anonymous jury issue and the trial incidents described above were handled.

[26]These principles are secured by art. 12 of the Massachusetts Declaration of Rights. *Commonwealth* v. *Robichaud,* 358 Mass. 300, 302 (1970).

[27]We disagree with the dissent's argument that the principles set forth in *Commonwealth* v. *Robichaud, supra* at 301, 303, have been eroded by certain pronouncements of the Michigan Supreme Court. *Robichaud* relied as much on the decision of that court in *People* v. *Medcoff,* 344 Mich.

was designed to ascertain whether the jurors could remain impartial after the trial incidents that had just occurred. Thus, notwithstanding the Commonwealth's argument that the defendant's presence might have been "counterproductive," he had the right to attend that proceeding.[28]

For the reasons stated, the judgment is reversed, the verdict is set aside, and the case is remanded for retrial.

*So ordered.*

NOLAN, J. (dissenting, with whom Lynch, J., joins). In reversing the defendant's conviction of being an accessory

---

108 (1955), as on the general common law rule that the defendant "has a right to be present when jurors are being examined as to their qualifications." *Robichaud, supra* at 302, citing Annot., 26 A.L.R.2d 762, 766 (1952). This theoretical support for the *Robichaud* court's decision remains sound. See generally Annot., 33 A.L.R.4th 430, 434-435 (1984). Moreover, notwithstanding the overruling of *Medcoff* by the Michigan Supreme Court, see *post* at 544, the principles set forth in *Robichaud* have remained an integral part of Massachusetts law. See *Martino, supra* at 284-287, and cases cited.

In *Martino, supra* at 284-286, decided just over one year ago, we cited *Robichaud* for the proposition that the defendant had the right to attend a proceeding in which the trial judge questioned a juror about a "serious problem" which she felt had arisen during trial. (This proceeding disclosed that the juror's grandfather's murder conviction was not reported in her juror questionnaire form, and we held that the erroneous exclusion of the defendant did not warrant reversal primarily because the defendant had agreed to the course of action taken by the trial judge.) In the present case as well, the *Robichaud* rule gave the defendant the right to attend a proceeding in which serious problems relating to the jurors were to be discussed. We shall adhere to our court's long-standing tradition of jurisprudential independence and we reaffirm the principles expounded in *Robichaud* and its progeny.

[28]The Commonwealth's attempt to draw a parallel between the present case and *Commonwealth* v. *Senati*, 3 Mass. App. Ct. 304, 307 (1975), is misplaced. In *Senati*, the defendant forfeited his right to be present at his trial by repeatedly refusing to obey the judge's order that he return to the dock and refrain from shouting accusations that police officers had lied. The defendant in the present case did not display such unrelenting determination not to comply with courtroom decorum. Should a defendant engage in inappropriate conduct in such circumstances, a judge is not without power to take such remedial action as may be necessary. See *Illinois* v. *Allen*, 397 U.S. 337, 344 (1970).

before the fact to murder in the first degree, the court writes, *ante* at 520, "We come now to two interrelated errors committed at trial which require us to conclude that we must reverse the conviction and order a new trial." The court identifies the errors as the use of an anonymous jury and an ex parte examination by the trial judge of "some" members of the jury.[1] *Ante* at 520. The court then discusses two aspects of the anonymous jury "error," the burden on the presumption of innocence and the statutory challenge. The court reserves most of its fire for the statutory challenge, concluding that the judge's failure to comply with the statute was error. I disagree with the court's conclusion on each issue and dissent.

1. *G. L. c. 277, § 66.* The court is in error when it says that "[t]he defendant argues that the use of an anonymous jury violated G. L. c. 277, § 66." *Ante* at 523. The defendant raises no such argument and makes only a passing reference to the subject statute in his brief. The "so-called" argument is reproduced in full as follows: "Our statutory scheme for the trial of life felonies requires that the list of potential jurors be made available to the defendant. G. L. c. 277, § 66." Not only is the statement incorrect, as I shall discuss below, but it falls far below what is required to raise an appellate argument in this court.

Apart from our directive under G. L. c. 278, § 33E (1990 ed.), our appellate jurisdiction in this case is limited to those arguments raised by the defendant in his brief. Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975). "An argument on an issue . . . shall require more than a mere passing reference." J.R. Nolan, Appellate Procedure 158 (1991). See *Karen Constr. Co.* v. *Lizotte,* 396 Mass. 143, 148 n.7 (1985) (Liacos, J.) (one sentence treatment of issue is "insufficient appellant argument"), quoting *Tobin* v. *Commissioner of Banks,* 377 Mass. 909, 909 (1979). Given these pronouncements, and the presence of only a mere passing reference to

---

[1]The record reveals that the judge interviewed all of the jurors.

§ 66 in the defendant's brief, I conclude that the defendant waived the argument, assuming he had one to waive.

It is interesting to note that the Commonwealth did not cite the statute or respond to this "phantom" argument in its brief. A response was not necessary. The defendant did not raise the argument. Thus, the court reverses a conviction of being an accessory before the fact to murder in the first degree on the basis of an argument the defendant neither raised, nor briefed, nor argued in this court.

For the purposes of argument, I shall assume that the defendant preserved the issue below and raised it in his brief. The court is wrong to conclude that the defendant was entitled to the list of jurors. I begin with the statute, which provides: "A prisoner indicted for a crime punishable with death or imprisonment for life, upon demand by him or his counsel upon the clerk, shall have a list of the jurors who have been returned . . . ." G. L. c. 277, § 66. The statute expressly provides that the defendant or his counsel must first demand the list from the clerk before he is entitled to receive it. Neither the defendant nor his counsel ever demanded the list from the clerk.[2] Accordingly, the defendant waived his rights to it.

The court relies on an analogous Federal statute, codified at 18 U.S.C. § 3432 (1988), which provides: "A person charged with treason or other capital offense *shall . . . be furnished* with a copy of the indictment and a list of the veniremen . . . stating the place of abode of each venireman . . . ." (emphasis supplied). The court analogizes G. L. c. 277, § 66, to the Federal statute and declares, "Like its Federal counterpart § 66 'is mandatory . . . and failure to allow de-

---

[2] During argument before the judge on the Commonwealth's motion to empanel an anonymous jury, the defense counsel argued against empanelment of an anonymous jury and in favor of the release of the jurors' names and addresses. The defense counsel, however, never pressed his demand on the clerk as required by statute. The defendant's reference during a motion argument to the need for names and addresses falls short of the statutory demand requirement. To use the court's phrase, *ante* at 524, "such construction accords with the plain meaning of these words." Further, I did not find a single reference to the subject statute in the record.

fendant its benefits [is] plain error' " (citation omitted). *Ante*
at 526. While the Federal statute is plainly mandatory, as
evidenced by the word "shall," the same cannot be said of
§ 66. A judge's obligation to provide the list to the defendant
under § 66 is expressly conditioned on the defendant's de-
mand for the list. Absent a demand from the defendant, a
judge is not obligated to provide the list. The State statutory
scheme is clear: No demand, no list; no demand, no error.[3]
Further, the defendant's failure to demand the list and assert
his statutory rights is not error and relief is not warranted
under § 33E.

2. *Presumption of innocence.*[4] While the court's discussion
on the presumption of innocence is dictum, I take issue with
it. The court opines that the procedures the judge employed
in empaneling an anonymous jury violated the defendant's
right to due process of law. To this end, the court concludes,
shall I say, that the empanelment of an anonymous jury im-
permissibly burdened the presumption of innocence. I
disagree.

First, the court fails to address the competing interests at
stake and then fails to balance the competing interests in its
scantily reasoned due process analysis. In spite of this, the
court issues directives to the trial court on the management
of anonymous juries in the future. I am at a loss to under-
stand how the court can say what the due process clause re-
quires based on the facts of this case without first conducting
the requisite balancing test and setting forth its reasoning

---

[3]I pause to cite two Federal cases that support the proposition that fail-
ure to comply with the "mandatory" Federal statute is not always revers-
ible error, see *Brown* v. *United States*, 63 F.2d 136, 137 (D.C. Cir. 1933);
*Eagles* v. *United States*, 25 F.2d 546, 548 (D.C. Cir.), cert. denied, 277
U.S. 609 (1928).

[4]The court does not discuss whether empaneling an anonymous jury, ab-
sent the statutory challenge (G. L. c. 277, § 66), impermissibly burdens
the defendant's right to exercise his peremptory challenges. Any adverse
impact stemming from the withholding of the names, addresses, and places
of employment of the prospective jurors was offset by the scope of informa-
tion each juror provided in the questionnaire and by the extensive voir dire
questioning.

and conclusions. Even more troubling is the court's willingness to elevate "guidelines" which other courts have articulated for the use of anonymous juries to the rule of law. See *United States* v. *Tutino*, 883 F.2d 1125, 1132 (2d Cir. 1989), cert. denied, 493 U.S. 910 (1990), citing *United States* v. *Thomas*, 757 F.2d 1359, 1365 (2d Cir.), cert. denied sub nom. *Fisher* v. *United States*, 474 U.S. 819 (1985).

The Federal pronouncements on the due process implications of empaneling an anonymous jury are clear — "although the presumption of innocence is of significant importance, and is protected by the due process clause . . . there is no *per se* rule that it may not be burdened." *United States* v. *Thomas*, 757 F.2d 1359, 1364 (2d Cir. 1985). Accordingly, the Federal courts have balanced the government's interest in safeguarding jurors and preserving the integrity of the judicial process with the defendant's interest in avoiding erosion of the presumption of innocence when called on to analyze a due process claim arising from the empanelment of an anonymous jury. *Id.* at 1365. See *United States* v. *Gotti*, 777 F. Supp. 224, 227 (E.D.N.Y. 1991) (balance integrity of judicial process against preserving presumption of innocence); *United States* v. *Melendez*, 743 F. Supp. 134, 137 (E.D.N.Y. 1990) (balancing competing interests); *United States* v. *Edmond*, 730 F. Supp. 1144, 1145 (D.D.C. 1990) (court must balance interests of criminal justice system against defendants' interests), citing *United States* v. *Tutino, supra* at 1132-1133, and *United States* v. *Scarfo*, 850 F.2d 1015, 1022-1023 (3d Cir.), cert. denied, 488 U.S. 910 (1988); *United States* v. *Coonan*, 664 F. Supp. 861, 862 (S.D.N.Y. 1987) (balance government's interest in safeguarding jurors with defendants' interest in avoiding erosion of presumption of innocence). To be sure, a practice burdening the presumption of innocence calls for "close judicial scrutiny." *United States* v. *Thomas, supra* at 1363, citing *Estelle* v. *Williams*, 425 U.S. 501, 504 (1976).

To this end, the court's opinion is noteworthy for what it does not say. The court chooses to ignore the substantial government interest underlying the Commonwealth's request for

empanelment of an anonymous jury — protecting the jurors and their families from violence, actual or threatened, and shielding the jurors from the potential taint of external influence, thereby preserving the integrity of the judicial process.

In support of its motion for the empanelment of an anonymous jury, the Commonwealth cited a number of Federal cases involving reputed members of organized crime in which the courts looked with approval on the use of anonymous juries. See, e.g., *United States* v. *Thomas, supra.* The Commonwealth argued that the defendant was connected with organized crime and was as "dangerous" as the defendants in the Federal cases cited. The Commonwealth further pointed to threats to the judicial system and an incident of jury tampering that had occurred during the defendant's Federal trial.[5] The Commonwealth concluded its argument quoting *United States* v. *Thomas, supra* at 1362: the defendant faced serious charges which leave him "little to lose by tampering with witnesses or obstructing the trial." As the judge allowed the motion without written opinion, it is safe to assume that it was a combination of these factors that formed the basis of his decision.

I am satisfied that three facts, the jury tampering which occurred during the defendant's Federal trial, the defendant's link with organized crime,[6] and the severity of the pen-

[5]From the Commonwealth's motion, we learn that after the commencement of the Federal trial, the government obtained information that a list of empaneled jurors was being circulated by associates of the defendant. Apparently, the list was being circulated to organized crime associates in an effort to determine whether any one of the jurors could be bribed. Following an investigation by the Federal Bureau of Investigation, the individual who was alleged to have circulated the list was convicted of obstructing justice.

During jury deliberations in the Federal trial, a deliberating juror was approached in an attempt to influence her vote. See *United States* v. *Angiulo*, 897 F.2d 1169, 1183 (1st Cir.), cert. denied, 498 U.S. 845 (1990). The responsible individual was later convicted for obstructing justice.

[6]The judge could have considered the defendant's link to organized crime in light of the prior Federal proceedings which chronicled the defendant's participation in organized, lawless, and violent activity. See *United States* v. *Angiulo, supra* at 1176-1178. I note, however, that it is the reasonable likelihood of juror intimidation given the aforementioned

alty facing the defendant, taken together, justified the judge's decision to empanel an anonymous jury. In my view, the judge properly responded given his " 'heavy responsibility' . . . to preserve the impartiality of the jury," *Commonwealth* v. *Allen*, 379 Mass. 564, 574-575 (1980), quoting *Commonwealth* v. *Dickerson*, 372 Mass. 783, 794 (1977), and the significant government interests at stake.

The court makes much of the fact that the judge did not make written findings in support of his decision to empanel an anonymous jury. *Ante* at 527 & n.21. The court's reliance on this issue is a stalking horse. In the celebrated case of *United States* v. *Barnes*, 604 F.2d 121, 133-134, 137 (2d Cir. 1979), cert. denied, 446 U.S. 907 (1980), the trial judge decided sua sponte to empanel an anonymous jury. See *United States* v. *Melendez*, *supra* at 136. Nonetheless, the *Barnes* court upheld the judge's decision to empanel an anonymous jury.

The United States Court of Appeals for the Third Circuit expressly rejected a defendant's challenge to a judge's decision to empanel an anonymous jury based on the judge's failure to issue written findings supporting his decision to empanel an anonymous jury. *United States* v. *Eufrasio*, 935 F.2d 553, 574 (3d Cir.), cert. denied sub nom. *Idone* v. *United States*, 502 U.S. 925 (1991). In so holding, the *Eufrasio* court noted that the judge in *United States* v. *Scarfo*, *supra*, also failed to issue written findings when granting the government's motion for an anonymous jury. *Id.* at 574. On appeal, the *Scarfo* court, like the *Eufrasio* court, upheld the use of the anonymous jury despite the absence of written findings supporting the judge's decision. While a judge is advised to reduce to writing his or her reasoning supporting a decision to empanel an anonymous jury, a failure to do so is not reversible error.

---

activities, and not "the incantation of the words 'the mob' or 'organized crime' " that militates in favor of an anonymous jury. *United States* v. *Vario*, 943 F.2d 236, 241 (2d Cir. 1991), cert. denied, 502 U.S. 1036 (1992).

I turn now to the burden on the presumption of innocence. The court's field of vision is narrowed to this point. The court declares that "[u]nder due process principles, if jurors become aware of their anonymity — as happened in the present case — the judge must take affirmative measures to protect the due process rights of the accused." *Ante* at 528. The court wrongly assumes that the presumption of innocence is necessarily burdened and "that anti-defendant bias is the only possible, or even the most likely, reaction" to suspect when jurors know of their anonymity. *United States* v. *Scarfo, supra* at 1026. While the court offers no evidence to support its conclusion, there is empirical evidence demonstrating that empaneling an anonymous jury does not work to a defendant's detriment, see *United States* v. *Perry*, 754 F. Supp. 202, 202-203 (D.D.C. 1990), wherein the court discusses cases in which anonymous juries have acquitted defendants. Indeed, as the *Scarfo* court wrote: "Predicting juror responses to the anonymity practice is pure speculation.[7] A juror who fears a defendant's retaliation might be more apt to return a guilty verdict despite such fears rather than because of them. . . . If, however, anonymity dispels apprehension, it serves the ideal of dispassionate judgment."[8] *United States* v. *Scarfo, supra* at 1026.

---

[7]In a footnote, the *Scarfo* court offered the following example to illustrate the point: "Seven jurors in a criminal trial received unsigned letters which read: 'Find these guinea sons of bitches guilty. Don't let them get away with something they did a long time ago. Send them to jail now, all those Mafia bums.' *United States* v. *Borelli*, 336 F.2d 376, 392 (2d Cir. 1964), cert. denied, 379 U.S. 960 . . . (1965). Several of the jurors interpreted the notes as clever attempts to *discourage* convictions, a meaning precisely opposite to the words the author wrote. *Id.*" (Emphasis in original.) *United States* v. *Scarfo*, 850 F.2d 1015, 1026 n.1 (3d Cir.), cert. denied, 488 U.S. 910 (1988).

[8]To be sure, the defendant's right to due process is inexorably linked to his right to a fair trial by an impartial jury. "As judges, we are aware that, even in routine criminal cases, veniremen are often uncomfortable with disclosure of their names and addresses to a defendant." *United States* v. *Scarfo, supra* at 1023. "If a juror feels that he and his family may be subjected to violence or death at the hands of a defendant or his friends, how can his judgment be free and impartial as the Constitution requires?"

The inquiry, however, does not stop here. For one must consider *all* facts that bear on the issue of the magnitude of the burden on the presumption of innocence, either positively or negatively, to determine the net effect. This leads to the next point of error which I assign to the court.

The court suggests, *ante* at 528, that the judge in the present case took no precautions to minimize the burden on the presumption of innocence. This aspect of the court's opinion is misleading. The judge protected the due process rights of the accused. First, most of the jurors learned of their anonymity from the judge. After informing the jurors of their anonymity, the judge probed the impartiality of each juror. In each and every case, the juror responded that he or she could remain impartial given the circumstances. Further, the judge gave a detailed instruction on the presumption of innocence while charging the jury.[9]

The court makes much of the fact that the judge failed to ascertain how some of the jurors had learned of their anonymity. *Ante* at 529. The court misses the point. The crucial

---

*United States* v. *Barnes*, 604 F.2d 121, 140-141 (2d Cir. 1979), cert. denied, 446 U.S. 907 (1980).

[9]Excerpts from the judge's jury charge on the presumption of innocence are as follows:

"The presumption of innocence is a descriptive phrase for a very vital personal right. It's a right that I have and a right that you have, a right that [the defendant] has. . . . And like any right, it then throws upon you a corresponding duty. The right that he has and that he claims this day and which is your duty as his right is to have you decide this case wholly, entirely and exclusively . . . on the evidence that you have been offered here. Decide this case on the strength or weakness of the evidence produced for your consideration and . . . on no other consideration whatsoever. That's his right.

"The fact that the police shadowed him; the fact that he may have been arrested, that his picture may have been taken; the fact that he may have been inquired of; the fact that he's indicted; the fact that he was charged in some other place, some other crime related to this — and you have heard that — the fact that he is here inside this bar enclosure; the fact that he is at the bar; those are all facts. All of them considered alone, all of them considered together, they do not warrant you in drawing an inference adverse to this man . . . . For he has a right and you have the duty to decide this case on what has been produced here in this courtroom for you and for your consideration."

issue is the continuing impartiality of the jurors — a fact that the judge properly studied and addressed.

Applying the balancing test and weighing the Commonwealth's interest in safeguarding both the jurors and the integrity of the judicial process against the defendant's interest in preserving the presumption of innocence, I conclude that the scale tips heavily in favor of the Commonwealth. This conclusion comports with numerous opinions of the United States Supreme Court which have not ignored the harsh realities of criminal trials and have upheld the use in certain circumstances of practices that might otherwise impermissibly burden the presumption of innocence. See *Illinois* v. *Allen*, 397 U.S. 337, 344 (1970) (defendant appearing bound and gagged before the jury permissible in certain extreme circumstances); *Holbrook* v. *Flynn*, 475 U.S. 560, 569 (1986) (presence of uniformed State troopers in courtroom did not burden presumption of innocence given need). "The law as to jury selection is not so unbending that it cannot, or should not, be accommodated to the realities of modern day trials . . ." (footnote omitted). *United States* v. *Barnes, supra* at 142-143. "Recognizing that jurors are quite aware that the defendant appearing before them did not arrive there by choice or happenstance, we have never tried, and could never hope, to eliminate from trial procedures every reminder that the State has chosen to marshal its resources against a defendant to punish him for allegedly criminal conduct." *Holbrook* v. *Flynn*, 475 U.S. 560, 567 (1986).

3. *Juror interviews.* As to the alleged error involving the ex parte examination of the jurors, the court writes, "[W]e hold that the judge erred when he barred the defendant and his counsel from the voir dire that followed the 'whammy' incident, thereby compounding the prejudice caused by the mishandling of the anonymous jury issue." *Ante* at 530. This is obfuscation. It is not clear whether the ex parte incident was, in and of itself, error warranting reversal or merely an incident that compounded the prejudice resulting from empaneling an anonymous jury. I assume that it was error and express my views accordingly. The court misreads our

precedent and wrongly concludes that the "whammy" inci-
dent was of consequence, thereby necessitating the defend-
ant's presence.

In *United States* v. *Gagnon*, 470 U.S. 522 (1985), the
United States Supreme Court considered a case remarkably
similar to the present case. *Gagnon* involved four codefend-
ants. "During the afternoon recess on the first day of trial
the District Judge was discussing matters of law in open
court with the [defendants], their respective counsel, and the
Assistant United States Attorney, outside the presence of the
jury. The bailiff entered the courtroom and informed the
judge that one of the jurors . . . had expressed concern be-
cause he had noticed [defendant] Gagnon sketching portraits
of the jury. Gagnon's attorney admitted that Gagnon had
been sketching jury members during the trial." *Id.* at 523.

The trial judge then stated that he wanted to see the juror
in his chambers to assess the juror's impartiality in light of
the events. Gagnon's attorney was present during the voir
dire. Neither the defendants, nor counsel for the other de-
fendants, were present during the voir dire. The judge dis-
cussed the incident with the juror and concluded the meeting
after eliciting from the juror his willingness to continue as an
impartial juror. After the jury returned guilty verdicts on the
counts charged, each of the four codefendants claimed that
the judge violated their constitutional right to an impartial
jury in excluding them from the voir dire. The Supreme
Court, in a per curiam decision, rejected the defendants'
argument.

The Court wrote, "The encounter between the judge, the
juror, and Gagnon's lawyer was a short interlude in a com-
plex trial; the conference was not the sort of event which
every defendant had a right to personally attend . . . . [The
defendants] could have done nothing had they been at the
conference, nor would they have gained anything by attend-
ing. . . . Indeed, the presence of Gagnon and the other [de-
fendants], their four counsel, and the prosecutor could have
been counterproductive. [The juror] had quietly expressed
some concern about the purposes of Gagnon's sketching, and

the District Judge sought to explain the situation to the juror. The Fifth Amendment does not require that all parties be present when the judge inquires into such a *minor occurrence*." (Emphasis supplied.) *Id.* at 527.

Since the Court's ruling applied equally to the defendants whose counsel were not present at the voir dire, *Gagnon* is forceful authority for the argument that the "whammy" incident in the present case is not a matter of consequence. Remarkably, however, this court does not cite *Gagnon* nor make any attempt to distinguish it from the present case. The similarities between the "whammy" incident and the events in *Gagnon* are too striking to be ignored. The court offers no support for its conclusion that the "whammy" incident is a matter of consequence in view of the Supreme Court's conclusion that the *Gagnon* incident was a "minor occurrence."

Rather than addressing *Gagnon*, this court bases its decision on the Massachusetts Declaration of Rights. To this end, the court relies on *Commonwealth* v. *Robichaud*, 358 Mass. 300 (1970). On this point the court comes out from the shadows, and errs, blinded by the light of its own decisions.

As a threshold matter, *Robichaud* is distinguishable from the present case. In *Robichaud*, the defendant filed a motion for a mistrial after the close of evidence and before closing arguments. A hearing on the motion was held in the judge's lobby. The defendant, Robichaud, was not present at the hearing. Defense counsel objected to the court's allowing the hearing to proceed without the defendant.

In support of the motion, the defendant produced two witnesses who testified that they had heard three of the jurors discussing his case at a local restaurant and heard them express their opinion that all of the defendants on trial were guilty. Two of the three jurors testified, admitting that they had discussed the case but denying that they had expressed such an opinion. The trial judge concluded that the jurors stood impartial and denied the motion. The defendant was convicted, and appealed claiming that the trial judge erred

by conducting the hearing in his absence. This court agreed, and reversed the judgment.

Four distinctions between *Robichaud* and the present case warrant a different result from that which we reached in *Robichaud*. First, *Robichaud* concerned the defendant's exclusion from a hearing on a motion for a mistrial. The issue in the present case involves an ex parte voir dire of jurors stemming from claims of alleged misconduct by the defendant. Second, *Robichaud* involved two related questions, the continuing impartiality of the jurors *and* the merits of the defendant's motion for a mistrial. The present case involves only the issue of the impartiality of the jurors. Third, the charges involved in *Robichaud* centered on a question of alleged misconduct by three jurors. The issue in the present case arose due to alleged misconduct of the defendant. Fourth, in *Robichaud*, the judge conducted a hearing and heard the testimony of four individuals to determine the veracity of the complaint. In the present case, the judge did not conduct the interviews to determine whether the defendant was giving the jurors the "whammy," but, rather, to insure that the jurors could be impartial, thereby safeguarding the defendant's right to trial by an impartial jury.

These distinctions warrant a different outcome from that which this court reached in *Robichaud*. The defendant does not have a right to be present at all stages of the proceedings. See *Commonwealth* v. *MacDonald (No. 1)*, 368 Mass. 395, 398-400 & n.3 (1975). The guiding principle is that due process requires that the defendant be allowed to be present "to the extent that a fair and just hearing would be thwarted by his absence." *Snyder* v. *Massachusetts*, 291 U.S. 97, 108 (1934). See K.B. Smith, Criminal Practice and Procedure § 1591 (2d ed. 1983).

On the basis of this test, the defendant's presence during the interviews "was not required to ensure fundamental fairness or a 'reasonably substantial . . . opportunity to defend against the charge.'" *United States* v. *Gagnon*, 470 U.S. 522, 527 (1985), quoting *Snyder* v. *Massachusetts*, *supra* at 115. The defendant's presence at the interviews would have

been counterproductive. The jurors would not have openly and freely discussed the alleged incident had the defendant or his counsel been present. Considering "the justice or injustice of [the] exclusion . . . in the light of the whole record," *Snyder* v. *Massachusetts, supra* at 115, the judge steered a prudent course in excluding the defendant and defense counsel from the interviews, and then, after completing the interviews, making the transcript of those interviews available to them. See *Commonwealth v. Bobilin*, 25 Mass. App. Ct. 410, 415 (1988).

While the court relies on *Robichaud*, the *Robichaud* court relied almost exclusively on a Michigan case, *People* v. *Medcoff*, 344 Mich. 108 (1955). *Commonwealth* v. *Robichaud, supra* at 302-303. The *Robichaud* court noted that *Medcoff* was "the only case found to be directly on point." *Id.* The *Robichaud* court quoted at length from the *Medcoff* opinion, agreed with its reasoning, and adopted it in support of the so-called *Robichaud* rule. *Id.* at 302-303. The Michigan Supreme Court overruled *People* v. *Medcoff, supra*, in *People* v. *Morgan*, 400 Mich. 527, cert. denied sub nom. *Cargile* v. *Michigan*, 434 U.S. 967 (1977), and announced a new, less restrictive rule under which the defendant in this case could not possibly prevail. Thus, this court's decision is based on *Robichaud*, which is based on *Medcoff*, which has been overruled.

4. *Conclusion.* The defendant does not raise one argument on appeal that warrants reversing his conviction. The court's decision tests the limits of interpolation, extrapolation, not to mention logic, justice, and the rule of law. The jury have spoken and the verdict deserves to stand. As the court concludes otherwise, I dissent. Audi alteram partem.