Garsh, J.
In August of 1986, a Superior Court jury convicted Michael Kevin Dupont (“Dupont") of unlawfully carrying a firearm in a motor vehicle, three counts of assault with a dangerous weapon, assault and battery by means of a dangerous weapon, armed assault with intent to rob, armed assault with intent to kill, and armed robbery. No sentence was imposed for armed assault with intent to rob because the court deemed it to be duplicative with the armed robbery. On the armed robbery conviction, Dupont was ordered to be confined to MCI, Cedar Junction for a period not to exceed forty years nor less than thirty years. On the armed assault with intent to kill conviction, Dupont was ordered to be concurrently confined to MCI, Cedar Junction for a period not to exceed ten years nor less than five years. On the assault and battery by means of a dangerous weapon conviction, Dupont was ordered to be concurrently confined to MCI, Cedar Junction for a period not to exceed ten years nor less than five years. On the three count conviction for assault with a dangerous weapon, Dupont was ordered to be concurrently confined to MCI, Cedar Junction for a period not to exceed five years nor less than three years on e¿ch count. On the unlawfully carrying a firearm in a motor vehicle conviction, Dupont was ordered to be concurrently confined to MCI, Cedar Junction for a period not to exceed five years nor less than three years.
Following the verdict, on August 28, 1986, Dupont filed a “Motion for a New Trial R. C. P. 25" with a supporting affidavit. Notice was given to the trial judge (Forte, J.) and to the Assistant District Attorney. That motion was never ruled upon. The motion does not refer to the empanelment of an anonymous jury as an error for which Dupont was seeking a new trial. The supporting affidavit does, however, allege as error the court’s refusing Dupont a stay to appeal in a paragraph dealing, in part, with issues related to the empanelment.
On September 10, 1986, the clerk docketed a motion from Dupont for post-trial discovery and his “Motion for Release From Unlawful Restraint Pursuant to M.R.C.P. 30."[1] Notice was sent to the trial judge and to the Assistant District Attorney. The new trial motion, which requested post-trial discovery and an evidentiary hearing pursuant to Rule 30(c)(4), was not acted upon. Neither the Rule 30 motion nor Dupont’s affidavit and other supporting documents make reference to the empanelment of an anonymous jury or to redacted juror questionnaires.[2] However, Dupont’s affidavit, docketed in connection with the related motion for post-trial discovery, states that the “affianthad his jury list taken from him, and had surnames deleted, and was prejudiced in his selection or challenges because of this ...” The motion for post-trial discovery and Rule 30 motion were never acted upon.
Dupont filed a timely notice of appeal.[3] The court reporter was directed on December 19, 1986 to prepare a transcript of “evidence — motions, August 5 and 7, 1986, and Trial commencing August 7, 1986." When the court reporter delivered the transcripts in March of 1989 to the clerk of courts, he did not include a transcript of the proceedings that took place on August 5, 1986 nor did he include a transcript of any proceedings on August 7, 1986 prior to the start of the trial itself. The record assembled for appeal thus did not contain these transcripts. In May of 1989, Dupont wrote to the court reporter concerning the transcripts of the motion session on August 5 and the proceedings on August 7 prior to the jury’s being empaneled. In November of 1989, the court reporter advised that he was not able to locate the tapes of the day of pretrial motions that were still outstanding, but he believed that sometime after the completion of the trial, such a transcript had been ordered by the judge and prepared. The court reporter suggested that the trial judge be inquired of to see if he had the transcript. Various stays were then granted by the Appeals Court. In 1991, the Appeals Court ordered the Commonwealth to make inquiries of the trial judge as to the existence of any additional transcript. The Commonwealth represented that a letter had been written to the trial judge and that the Appeals Court would be advised if additional information became available. There does not appear to have been any follow up communication by the Commonwealth concerning its *2 correspondence with the trial judge. The appeal was dismissed in 1993 for lack of prosecution.
An amended pro se motion for a new trial was filed by Dupont on May 15, 1995. This motion, a copy of Dupont’s federal habeas petition, asserts, in part, “jury impanelment violations, anonymous jury ... no ch. 234, §28 statutory questions related to jury, instruction defects on presumption of innocence . . .” Dupont alleges in this 1995 pleading that he was surprised by the receipt of blacked out juror forms, obstructing his ability to exercise peremptory challenges, and that he was denied an opportunity to object. The amended motion, which was forwarded to a judge other than the trial judge,[4] also was never acted upon.
On November 6, 1997, and December 17, 1997, the Superior Court received two letters addressed to the Chief Justice seeking action on the still pending new trial motion. Both letters maintain that Dupont is entitled to a new trial because, among other reasons, there had been an anonymous jury and he was given blacked out juror forms. Dupont complains that his new trial motion was never ruled upon and seeks the assignment of a different justice. On February 19, 1998, the case was re-assigned. Counsel was appointed to represent Dupont, and Dupont was granted leave to file, with the assistance of counsel, another amended new trial motion.
Dupont’s amended motion maintains that his conviction was unlawfully obtained and that he is entitled to a new trial for the following reasons: 1) prejudicial jury empanelment irregularities in contravention of G.L.c. 234, §28, G.L.c. 277, §66, Article XII of the Massachusetts Declaration of Rights, and the Sixth and Fourteenth Amendments to the Constitution of the United States; 2) ineffective assistance of counsel, absence of waiver of counsel colloquy, denial of sufficient defense investigator’s fees and a continuance, withheld discovery files and obstructed law library and telephone access; 3) false statements by the Prosecutor and perjury by the Chief Investigator, motion to quash summons and ex parte subpoenas, other related witnesses and evidentiary exclusions, and suppression, concealment, and withholding of other suspected perpetrator exculpatory evidence; 4) a pattern of deliberate and prejudicial obstruction of Dupont’s direct and collateral appeals for twelve years; 5) prejudicial cumulative, instructional, and other, errors. In connection with the most recent amended new trial motion, Dupont filed a detailed affidavit describing his recollections of the empanelment.
This court held an evidentiary hearing with respect to the claim that Dupont had been tried by an anonymous jury and had been provided with blacked out juror questionnaires, reserving whether the remaining alleged trial errors had been waived and, if not, whether a hearing on those other issues is warranted.[5]
FINDINGS OF FACT
Based on all the credible evidence and reasonable inferences drawn from that evidence, the court finds the following facts:
On August 5, 1986, Dupont was brought from MCI Walpole to the Middlesex County Superior Courthouse in Lowell. At that time, Dupont had a co-defendant, Paul Miller (“Miller”), whose June 20, 1985 motion to sever had not been acted upon. On August 5, the court entertained several pre-trial motions in this proceeding and allowed Dupont’s motion to dismiss his appointed counsel. Dupont proceeded pro se.[6] The court stated that the trial would start on the following Monday, August 11, 1986.[7]
On Thursday, August 7, 1986, Dupont was again returned to Middlesex Superior Court in Lowell. That morning, the court allowed Miller’s motion to sever. Dupont was not present in the courtroom during the hearing on Miller’s motion to sever. In the holding cell, Dupont learned from Miller that their cases had been severed.
Later that morning, Dupont was brought into the courtroom and advised by the trial judge that jury selection in his case would begin that very afternoon.[8] The judge also mentioned something to the effect that, during jury empanelment, jurors would be identified by number rather than by name because of a Middle-sex County experiment.[9] Dupont did not object. The judge did not use the word “anonymous,” and he did not tell Dupont that the completed juror questionnaires he would be receiving would be redacted. Neither Dupont nor the Assistant District Attorneys trying the case believed or even suspected that they would not be given access to the full names of each prospective juror or that any information on the questionnaires as completed by potential jurors would be redacted. The court said nothing which would have made this apparent and what he did say was too unclear to trigger an obligation to object at that time.
Once he was returned to the holding cell, Dupont drafted requests for voir dire questions for filing with the court. He asked a court officer to transmit the questions to the clerk and to obtain the juror questionnaires from the clerk for him to review in advance. The court officer did neither. With respect to the list of voir dire questions, the court officer told Dupont that there would be an opportunity for him to file it prior to empanelment. There was not.
When Dupont re-entered the courtroom that afternoon, the clerk immediately provided Dupont with a stack of questionnaires. The Assistant District Attorneys had been provided with their copies of the juror questionnaires a few seconds earlier.
As the Commonwealth concedes, juror surnames were redacted from the questionnaires provided to the defendant. I credit Dupont’s testimony that the jurors’ street addresses were also redacted.[10] No other infor *3 mation on the questionnaires was redacted. Dupont was not otherwise given access to the names or addresses of any of the potential jurors.
Copies of the questionnaires given to the Commonwealth and to the defendant had been blacked out with a magic marker. Two of the questionnaires provided to the Commonwealth, but not to Dupont, accidentally contained surnames.[11]
The Commonwealth did not request redaction of the jurors’ surnames and addresses. Rather, the judge acted sua sponte. The judge made no written or oral findings as to a need for anonymity. There was no basis for the court to have inferred that Dupont was likely to engage injury tampering, threaten a juror, or otherwise interfere with the judicial process. Further, there was no basis for the court to have believed that the jurors would be exposed to evidence that would depict a pattern of violence by the defendant such as would cause a juror to reasonably entertain a worry about personal safety.
Very shortly after entering the courtroom on August 7, 1996,[12] the clerk asked the defendant to rise, placed him at the bar for trial, and informed Dupont that he had the right to challenge sixteen persons without giving any reason and others for good cause.[13] The prospective jurors then were sworn, following which the trial judge advised them that he would be asking them some questions, but first wished the parties to introduce themselves. When the court requested Dupont to introduce himself, Dupont told the prospective jurors his name. The following dialogue with the court then ensued in front of the prospective jurors:
Dupont: Your Honor, two matters. One I—
The Court: Well, let’s—
Dupont: — have submitted voir dire questions; and I would like to
The Court: Please. We’re going to impanel the jury now. All motions should have been filed prior to this, so please be seated.
Dupont: I would object, and I would ask for side bar so—
The Court: After we impanel the jury, I’ll give you— we’re going to argue some other motions. You may be seated, sir.
Dupont: This involves the jury. All right. As long as I may be heard, then.
Dupont was seeking a sidebar conference in order to object to the redacted juror questionnaires and to provide the court with his requests for voir dire questions. The questions that Dupont wanted the court to propound are as follows:
(1) Have you, your family, or friends ever been the victim of a robbery, larceny, violent crime or crime related to drug offenses?
(2) Are you or any member of your family related to law enforcement personnel or any state agency or branch?
3) Would you be more prone to believe the testimony of a police officer over that of a citizen witness or a defendant on trial?
4) One of the specific defenses raised here will be a toxic psychosis transient psychotic episode as it relates to a lack of criminal responsibility. Do you feel you can objectively consider such a defense as it may apply to acquittal or conviction? If you have any pre-conceived ideas or feelings concerning this, please notify the court at this time of your opinions on substance abuse of any defendant or witness.
The court’s failure to allow Dupont to approach the bench frustrated his ability to file the list of proposed voir dire questions, to articulate the grounds for his objection to the redacted questionnaires, and to make an explicit demand upon the clerk for the list of the juror names and addresses.
After asking whether any of the prospective jurors or any members of their families were related to or knew the Assistant District Attorneys or Dupont and receiving no response, the court informed them, as follows, about the charges:
[The] indictments allege that on the 7th or March, 1985, in Woburn or Burlington or Billerica, unlawful carrying on his person a firearm without authority and permission; did my [sic] by means of a dangerous weapon, to wit, a firearm, assault Edward Tedisco; did by means of a dangerous weapon, to wit, a firearm assault Willis[14] Dalton; did assault by means of a dangerous weapon Edward Rooney; did by means of a dangerous weapon assault and beat Susan Sullivan; armed robbery — [15]
The court then asked if the jurors had any interest in the case except as jurors. There was no response. The court did not advise, as set forth in the indictments, that the dangerous weapon allegedly used in the assault upon Mr. Rooney and in the assault and battery upon Ms. Sullivan was a firearm. The court did not mention, as set forth in the indictment, that the armed robbery involved the alleged theft of drugs from Case Pharmacy in Woburn. The court did not advise prospective jurors that Dupont also was charged with assault upon Ms. Sullivan with intent to rob her while armed with a dangerous weapon, to wit a firearm, nor did the court advise that Dupont was charged with assault upon Edward Tedisco with intent to murder him while armed with a dangerous weapon, to wit a firearm.
After reading a list of potential witnesses, the court asked if the prospective jurors knew any of the witnesses. Those jurors who responded affirmatively were individually questioned at sidebar. With respect to the first such person to be examined, the court officer called out the juror’s number. When this individual approached the bench, the clerk, as is typical, repeated the juror’s number and read out loud his full name, asking “Is that you, sir?” The judge interjected, *4 instructing the clerk “Don’t read the last names." That juror was excused by the court after disclosing that he knew some of the officers of the Burlington Police Department.
With respect to each of the remaining jurors who approached sidebar in response to this and all other questions, the clerk made no inquiry as to the identity of the individual. The person was called by the court officer by juror number. When the prospective juror approached the bench, the judge queried each as to his or her identity by reading the first name only in a inquiring tone of voice, to which the prospective juror generally simply responded “yes.”[16]
The other questions asked of the prospective jurors were whether they or members of their family had been victims of a violent crime, whether they had close relatives in law enforcement,[17] whether they had formed or expressed any opinions in relation to the case or the parties,[18] whether there was any reason, whatsoever, why they could not serve and decide the case fairly and impartially, whether they were sensible of any bias or prejudice in relation to the parties, and, finally, whether there was any reason, whatsoever, why the court should not declare the prospective jurors to be indifferent. The panel was then declared to stand indifferent.
Prior to declaring the jury panel to stand indifferent, the court did not inform the prospective jurors that an indictment is merely a charge or an accusation and not evidence that Dupont is guilty of anything. Prospective jurors were not advised that a defendant is presumed innocent until proven guilty, that the Commonwealth has the burden of proving the defendant’s guilt beyond a reasonable doubt, or that a defendant need not present evidence in his behalf. Jurors were not asked by the court whether they understood that a defendant is presumed innocent until proven guilty, that the Commonwealth has the burden of proving guilt beyond a reasonable doubt, or whether they understood that a defendant need not present evidence in his behalf.
After the panel was declared to stand indifferent, sixteen jurors were seated in the jury box. This was accomplished by the clerk’s calling out juror numbers. The parties then exercised challenges and additional persons, also called by juror numbers, were seated in the jury box to replace those who had been challenged. Had Dupont been granted access to the redacted juror information, he would have used it in deciding which jurors to challenge.[19] Among other things, he would have sought to exclude potential jurors whose street addresses suggested that they live in affluent neighborhoods. Dupont was unable to identify persons residing in Concord, Lincoln, and Lexington residential neighborhoods involved in other cases in which he had been a suspect. Dupont was unable to determine if prospective jurors resided in Newton close to the Rhodes Pharmacy, which had been robbed approximately twelve days prior to the armed robbeiy of the pharmacy for which he stood charged,[20] or to determine if prospective jurors lived close to the pharmacy that was the subject of the armed robbery indictment.
Prospective jurors were not expressly informed of their anonymity. Having one’s identity confirmed in a formal setting at sidebar, out of the presence of the public but within the hearing of the pro se defendant, by a judge who is inquiring by using only a first name is an odd procedure that is likely to cause some prospective jurors to assume that their last names are not being used so that the defendant will not hear them. It is also likely that such prospective jurors may assume that the judge has some special knowledge about the defendant that would justify such a security precaution. Some of the persons who were selected to serve as jurors may have had such thoughts. It is also likely that the jury included individuals who had served as jurors in the past and who had been selected in an empanelment process in which the clerk had read their first and last names when they approached sidebar and in which the clerk had read their last names as they were asked to take a seat in the jury box.
After the jury was selected, the court excused them until Monday morning. The jurors were not administered their oath as jurors prior to being excused.
Once the jury was excused, the court turned to the outstanding motions, mentioning that he believed that there were still three motions to dismiss pending. The judge also told Dupont that he understood “that, as of now, you have not turned in the questionnaires.” Dupont had not turned in the questionnaires because he was attempting to record what was and what was not on them. Dupont’s response is not fully recorded in the transcript.[21] The judge instructed him that he must return the questionnaires before leaving the courtroom. Thereafter, Dupont attempted once again to object to the empanelment of an anonymous jury, but he was interrupted by the court who wanted to proceed to argument on the motions to dismiss. Before he was stopped by the court, Dupont had said that he would like to make “a very brief contemporaneous record . . . Just prior to empaneling and bringing the juiy in, I asked some of the court officers to make a contemporaneous record — .”
The motions to dismiss were then heard by the court. The Commonwealth did not oppose Dupont’s Motion to Dismiss the count charging use of a firearm during the commission of a felony. The court took under advisement Dupont’s motion to dismiss on the grounds that c. 265, §17 is unconstitutional and his motion to dismiss for denial of a speedy trial. Dupont objected to the fact that the court had empaneled a jury prior to the court rendering a decision on the pending motions, to which the court responded: “The juiy has not been impaneled yet. They’ve only been selected. You’ll notice I didn’t swear them in.” The hearing terminated shortly after the judge announced that he had a verdict that he wanted to take. Immedi *5 ately prior to recessing, the clerk informed the court that Dupont had surrendered the juiy questionnaires. When Dupont returned the redacted questionnaires to the clerk, he requested that they be preserved.
On August 11, 1986, before the jury was brought in, the juror in seat number two was excused by the court. She had advised a court officer that she had a problem sitting as a juror. When queried by the court, she responded:
I just don’t think that I can be impartial in this case . . . I’m just veiy strongly against handguns .. . it’s very difficult for me to think, I guess, anyone who handles or uses them or owns them — I would have trouble thinking anything but guilty, I guess, going into this. Secondly . . . my brother-in-law was involved in a couple of problems with handguns.
The court then denied the pending motions to dismiss. Dupont raised a number of other issues. He advised the court twice that he had filed a motion to strike the panel. That morning Dupont had filed a Motion for Appropriate Relief and to Strike Petit Juiy and to Empanel a New Unbiased Jury. The Motion to Strike the Petit Juiy claims that the court had erred, in part, by “not allowing the defendant to register his objections to blacked out jury questionnaires given to him one minute before empanelment . . .” and requests that the forms be entered and sealed in the appellate record. At the end of the motion, Dupont reiterates his request as follows: “Censored Blacked out Jury Voire Dire forms are requested to be sealed in the appellate record of this case.” The motion is endorsed by the court “after hearing denied.” None of the redacted questionnaires were marked as exhibits for identification or otherwise preserved.
Dupont also told the court that he had filed a trial memorandum. Dupont had filed a Trial Memorandum that morning which seeks, inter alia, empanelment of a newjury and “requests an uncensored list in the next panel, while objecting to the present list.” The Trial Memorandum asserts that “no knowing and voluntary waiver of a right to an uncensored jury list was made by the pro se defendant ...” (emphasis in original). Dupont requested “a reasonable opportunity to study, profile and fully select, (including viewing of surnames) [a] new panel . . .” of prospective jurors. The court read the trial memorandum before the juiy was sworn.
Dupont objected to the use of an anonymous jury in his trial. Dupont made a request under G.L.c. 277, §66, for juror names and addresses.
During the hearing before the jury was brought into the courtroom on August 11, Dupont asked whether the judge would be giving a pre-charge instruction to the jury on evidence, objections, and the presumption of innocence. The trial judge declined to do so, erroneously replying:
I’ve already told them that. When I interrogated the jurors, I already told them do they understand that a defendant is presumed to be innocent; and the Commonwealth has burden of proof beyond a reasonable doubt. And none of them told me that they didn’t understand that.
Dupont also complained, before the jury was sworn, about the court’s failure to have asked the questions he wanted posed to the prospective jurors. Dupont said he had been assured by the Assistant District Attorney and a court officer that there would be an opportunity for him to file his handwritten requests for voir dire questions. The court then denied, in the exercise of its discretion, the first question as to whether any of the potential jurors, family, or friends had ever been the victim of a robbeiy, larceny, violent crime or crime related to drug offenses. With respect to the remaining questions, the court stated: “We’ve selected the juiy already. They haven’t been sworn, but I’m not going to interrogate them now; because if there are any problems, we have no jurors to replace them.” Dupont noted his objection.
After the jurors were sworn, the clerk read the indictments and bill of particulars. At Dupont’s request, the court instructed the juiy that the indictment and bill of particulars are “allegations upon which the defendant stands charged to be tried by you . . . they’re not evidence. The evidence is what you’re going to hear from the witness stand and from the exhibits.”
The phrase "presumption of innocence” did not make its appearance in the trial until August 14,1986, while the fifteenth witness was testifying. The Court inteijected: “I want to caution the juiy on something ... when we start this case off, there is a presumption of innocence of the defendant. It’s up the Commonwealth to prove beyond a reasonable doubt that he’s not innocent. . ,”[22]
On August 18, 1986, Dupont filed a Motion for Mistrial which, after hearing, was denied. The motion requests, in part, that the blacked out panel lists be sealed and submitted in the appellate record.
RULINGS OF LAW I. Standard of Review
“The trial judge upon motion in writing may grant a new trial at any time if it appears that justice may not have been done.” Mass.R.Crim.P. 30(b). The standard is purposefully broad, and the disposition of a motion for a new trial is addressed to the sound discretion of the trial court. Commonwealth v. Schand, 420 Mass. 783, 787 (1995); Commonwealth v. Moore, 408 Mass. 117, 125 (1990).
The Commonwealth argues that Dupont’s claim of error with respect to the empanelment of an anonymous juiy must be tested by the “substantial risk of a miscarriage of justice” standard[23] because Dupont failed to prosecute his appeal from the jury’s verdict,[24] *6 claim the error in his “first” new trial motion, or object at trial at the earliest opportunity. On the facts of this case, application of the “substantial risk of a miscarriage of justice” standard is not warranted.
A motion for a new trial may not, of course, be used as a vehicle to compel a trial judge to review and reconsider questions of law. Fogarty v. Commonwealth, 406 Mass. 103, 107 (1989). An appeal, however, brings to an appellate court “only questions of law, and never any questions of fact.” Old Colony Railroad Company v. Wilder, 137 Mass. 536, 538 (1884). Resolution of Dupont’s new trial motion required an evidentiary hearing and the finding of numerous facts. The disputed issues of fact were not limited to what was said by the trial judge or by any of the parties in the courtroom, and the redacted questionnaires were not evidence in the trial, making Mass.R.App.P. 8(c) an inadequate avenue to pursue an appeal on the anonymous jury issue. The legal questions raised in the new trial motion concerning empanelment of an anonymous jury could not properly have been raised before an appellate court without findings first being made in the trial court. With respect to this issue, Dupont has not “had his day in an appellate court, or forgone that opportunity.” Id.
This is also not a situation where one new trial motion has been denied and the defendant seeks a second bite at the apple. An issue not raised in an original or amended motion is deemed waived. Mass.R.Crim.P 30(c)(2). The waiver rule applies equally to constitutional and nonconstitutional claims which could have been raised, but were not raised in the defendant’s original motion. Commonwealth v. Amirault, 424 Mass. 618, 641 (1997). Dupont’s 1986 new trial motion was never denied. His subsequent filings have been construed by this court and accepted as amendments to that first new trial motion.
Finally, Dupont did not fail to preserve the issue by not timely objecting at trial. Dupont attempted to object to the empanelment of an anonymous jury as soon as he discovered that he was being deprived of access to the names and addresses of the jurors, but he was not permitted to voice an objection. Dupont’s written objections to the anonymous jury empanelment were filed at the earliest opportunity upon his return to court on August 11, 1986. At that time, the error was still capable of being remedied. In his written filings, Dupont specifically “requests an uncensored (jury) list in the next panel while objecting to the present (jury) list... no knowing and voluntary waiver of a rightto an uncensored jury list was made.” He also objects to the court “not allowing the defendant to register his objection to the blacked out juror questionnaires ...” Through these filings, which were read by the court before the jury was sworn, “the point was brought to the judge’s attention” and preserved for appellate review. Cf. Commonwealth v. James, 424 Mass. 770, 786 n. 25 (1997) (where defendant did not object to instructions, but filed a written request “more elaborate than” but “not, strictly speaking inconsistent with” the instructions given, defendant’s rights on appeal were preserved and, therefore, instructions were not evaluated under the substantial miscarriage of justice' standard).
II. G.L.c. 277, §66
G.L.c. 277, §66 provides that “[a] prisoner indicted for a crime punishable with death or imprisonment for life, upon demand by him or his counsel upon the clerk, shall have a list of the jurors who have been returned . . .” Nothing in the statute requires that the demand be written. Armed robbery was one of the crimes with which Dupont was charged; that is an offense punishable by a life sentence.[25] G.L.c. 265, §17. The words “list of jurors” as used in the statute include prospective jurors’ names and addresses. Commonwealth v. Angiulo, 415 Mass. 502, 524 (1993).
Dupont, who was acting pro se, attempted to make a timely demand upon the clerk for the juror list while in the holding cell on the morning of August 7, 1986 when he asked one of his custodians, a court officer, to communicate to the clerk his request to be provided with copies of the juror questionnaires in advance. Until that morning, Dupont did not know that his trial would begin that day. Dupont’s confinement obviously prevented him personally seeking out the clerk to demand the “list of jurors.” Moreover, immediately upon realizing that he was not going to be supplied with the identities of the jurors, Dupont attempted to demand access and to lodge an objection, but the court would not permit him to approach the bench. On these facts, to impose any other demand requirement would be unjust. Moreover, the conduct of the trial judge in sua sponte ordering the identities of the jurors deleted from the questionnaires, instructing the clerk not to mention the juror’s names as they approached sidebar, and questioning the prospective jurors by using their first name only makes clear that the court was determined that the defendant not have access to the names and addresses of the jurors. Any demand to the clerk at sidebar in between the examination of jurors being called to the bench would have been futile in the highly unlikely possibility that Dupont would have been permitted to get the words out. “The law traditionally does not require litigants to make a futile demand in order to preserve their rights.” Anguilo, 415 Mass. at 526 n. 20 (defendant excused from making a demand for list of jurors once “the judge granted the Commonwealth’s motion to withhold the jurors’ names, thereby making it futile — and indeed highly improper — for the defendant to request a list of prospective jurors from the clerk”). Furthermore, before jeopardy attached, Dupont objected in writing.
The language of Section 66 is mandatoiy. The failure to allow a defendant to obtain the benefits of G.L.c. 277, §66 is plain error which warrants the grant of a new trial motion with respect to the armed robbery *7 conviction without a showing by the defendant of actual prejudice. Anguilo, 415 Mass. at 526.
III. Constitutional Rights
Regardless of whether the crime is one to which a defendant may be sentenced to life imprisonment, empanelment of an anonymous jury raises grave constitutional questions. “The due process clause precludes the empanelment of an anonymous jury at a criminal trial unless anonymity is necessary to protect the jurors from harm or improper influence.” Id. at 527. “[T]he decision to empanel an anonymous jury ... is a drastic measure, which should be undertaken only in limited and carefully delineated circumstances.” United States v. Krout, 66 F.3d 1420, 1427 (5th Cir. 1995), cert. denied, 516 U.S. 1136 (1996). An anonymous jury, for example, may pass constitutional scrutiny when it is needed to protect against a serious threat to juror safety if the court also protects the defendant’s interest in conducting effective voir dire and maintaining the presumption of innocence. United States v. Thomas, 757 F.2d 1359, 1364 (2d Cir.) (defendants alleged to be “very dangerous individuals engaged in large-scale organized crime, who had participated in several ‘mob-style’ killings,” and who were charged with attempting to interfere with judicial process by murdering government witnesses), cert. denied sub nom. Fisher v. United States, 478 U.S. 819 (1985).[26] Mere invocation of the words “organized crime,” “mob,” or “Maña,” without something more, is insufficient to warrant an anonymous jury. United States v. Vario, 943 F.2d 236, 241 (2d Cir. 1991), cert. denied, 502 U.S. 1036 (1992). ‘This ‘something more’ can be a demonstrable history or likelihood of obstruction of justice on the part of the defendant or others acting on his behalf or a showing that trial evidence will depict a pattern of violence by the defendants and his associates such as would cause a juror to reasonably fear for his own safety.” Id. In the instant action, no good reason existed for empaneling an anonymous jury. The court was not aware of any threat to juror safety posed by Dupont, and no need to protect jurors from harm or improper influence was alleged by the prosecution. The trial judge could not reasonably have ascertained a threat to jurors from the charges in the indictments.
Three separate concerns have been articulated in cases discussing the empanelment of anonymous juries. Foremost, empanelment of an anonymous jury may undermine the presumption of innocence. E.g., Anguilo, 415 Mass. at 527. It also may impair a defendant’s right to a fair and impartial jury by denying information that might be helpful in the exercise of the right to utilize peremptory challenges or to seek that a juror be excused for cause. E.g., United States v. Edmond, 52 F.3d 1080, 1090 (D.C. Cir.), cert. denied, 516 U.S. 998 (1995). Finally, such a procedure makes it difficult for a defendant to know the identity of those persons who will be rendering judgment upon him. United States v. Sanchez, 74 F.3d 562, 565 (5th Cir. 1996).
A. Presumption of Innocence
The presumption of innocence is vital to a fair trial in our system of criminal justice. Angiulo, 415 Mass. at 527. See generally Estelle v. Williams, 425 U.S. 501, 503, reh’g denied, 426 U.S. 954 (1976). “(T]he fourteenth amendment to the United States Constitution embodies the notion reaching back to Roman law, that a ‘shield of innocence surrounds a defendant on trial.’ ” Angiulo, 415 Mass. at 526, quoting Thomas, 757 F.2d at 1363. States may not infringe upon the presumption of innocence by creating trial conditions that are likely to affect the jurors’ perceptions of the defendant unless there is a substantial government interest in doing so. Id. at 527.
The empanelment of an anonymous jury is a procedure that creates a risk that jurors will acquire an unfavorable opinion of the defendant. “An anonymous jury raises the specter that the defendant is a dangerous person from whom the jurors must be protected, thereby implicating the defendant’s constitutional right to a presumption of innocence.” United States v. Ross, 33 F. 3d 1507, 1519 (11th Cir. 1994), cert. denied, 515 U.S. 1132 (1995). Thus, even when there is a substantial government interest in protecting the identity of jurors — an interest wholly lacking in the instant case — in order to minimize the effect that a decision to empanel an anonymous jury might have on the jurors’ opinion of the defendant, curative instructions must be given if jurors become aware of their anonymity, Anguilo, 415 Mass. at 528, or if they are likely to be so aware. Scarfo, 850 F.2d at 1026.[27] Such curative instructions should be “carefully framed to avoid any risk that the anonymous procedures would appear extraordinary or reflect adversely on the defendant!].” Tutino, 883 F.2d at 1133. The jurors who were selected to try Dupont were given no information, explanation, or curative instructions regarding their anonymity.
In evaluating the likely effects of empanelment of an anonymous jury on the judgment of jurors, it is proper to take into account “common human experience.” Estelle v. Williams, 425 U.S. at 504. The jurors in the present case were not explicitly told that the defendant was being denied access to their identities, and if juror numbers alone had been used, those jurors who had not sat before as jurors might have assumed numbers alone to be the usual procedure. However, the court’s ascertaining the identify of each prospective juror called to sidebar by using the first name of such individual is sufficiently strange that some prospective jurors were likely to have assumed that the judge was using first names to make sure that the pro se defendant standing at sidebar did not hear the juror’s last name. It is uncommon to be addressed so familiarly upon meeting someone for the first time, and the familiar address is particularly unexpected *8 when used by a black-robed authority figure in a courtroom. It is also likely that some of the jurors who were chosen had served as jurors previously and thus, were aware that the procedure being used was different. Most likely, they attributed the difference to the defendant’s being pro se at sidebar. Prospective jurors who suspected that the judge was withholding their identities may have shared their speculations with fellow prospective jurors. Reason and common human experience point to the empanelment of an anonymous jury in this case as creating a serious risk of a deleterious impact on the presumption of innocence.
The impact of the lack of curative instructions regarding anonymity was exacerbated by the court’s failure to inform the jurors during voir dire that an indictment is not evidence of guilt and that a defendant is presumed to be innocent and by the court’s failure to ask voir dire questions worded in such as way as to ferret out jurors who may not accept the principle that a defendant is presumed innocent until proven guilty by the Commonwealth beyond a reasonable doubt. The judge did not ask potential jurors “questions designed to learn whether such juror understands that a defendant is presumed innocent until proven guilty, that the commonwealth has the burden of proving guilt beyond a reasonable doubt,[28] and that the defendant need not present evidence in his behalf .” G.L.c. 234, §28.[29] Nor did the court take other steps calculated to assure that jury understood and accepted these three principles. Commonwealth v. Gordon, 422 Mass. 816, 822-823 (1996); Commonwealth v. Tatro, 42 Mass.App.Ct. 918, 920 (rescript), rev. denied, 425 Mass. 1103 (1997).
Had there been some instruction on the presumption of innocence or had the questioning been more thorough, some jurors may have been challenged for cause. Indeed, one juror was excused after returning to the court on August 11, when she, without any prompting, represented to the court that she “would have trouble thinking anything but guilty” about anyone who uses hand guns. Given the failure to advise the jury during empanelment with respect to the presumption of innocence or to make clear that the indictments did not imply guilt, the failure to make any direct inquiries regarding understanding and acceptance of the presumption of innocence, and the risk that anonymity appeared extraordinary to some jurors, there may have been jurors other than the one excused after selection had been completed who also did not understand or accept the bedrock principles of American justice.
Dupont did not, by motion, ask that all jurors be asked the questions set out in G.L.c. 234, §28.[30] Nevertheless, in evaluating whether the use of an anonymous jury unduly burdened the presumption of innocence, this court need not put blinders on with respect to what the jury was and was not told with respect to the presumption of innocence.
After the jurors were selected and before they were excused to return the following Monday, the judge gave them no instructions regarding the presumption of innocence. When they returned, he gave no precharge on the presumption of innocence after mistakenly assuring Dupont, who had inquired as to whether he would be giving such a pre-charge, that he had already done so. The jurors thus heard nothing about the presumption of innocence until the fourth day of testimony.[31] Compare United States v. Crockett, 979 F.2d 1204, 1216 (7th Cir. 1992) (trial court repeatedly instructed anonymous jury, at voir dire, at beginning of trial, after completion of the government’s case in chief, before closing arguments, and in the jury instructions that defendant enjoys a presumption of innocence).
The empanelment of an anonymous jury without any curative instructions concerning the presumption of innocence, combined with the court’s failure to timely instruct the jury about the presumption of innocence or to make any voir dire inquiry as to whether jurors understood and accepted that a defendant is presumed innocent until proven guilty, possibly weakened Dupont’s case in some significant way.
B. Fair and Impartial Jury
In order to request that jurors be excused for cause and to exercise peremptory challenges intelligently, a defendant needs some reasonable means to gather information. Anguilo, 415 Mass. at 525, citing Commonwealth v. Allen 379 Mass. 564, 577 (1980).
A juror’s name and address are information potentially valuable to a party in deciding whether to challenge a juror either for cause or by the use of a peremptory challenge. The juror might turn out to be related to a party or a witness (yet not disclose this on voir dire) or to live in a neighborhood whose residents have demographic characteristics predictive of their likely response to the issues in the case. There is skepticism in some quarters about the ability of lawyers, even when aided by pricey consultants, to pick favorable jurors; but so long as we have challenges for cause and peremptory challenges the objection to anonymous jurors that it deprives the lawyers of information essential to their exercise of a valued procedural right cannot be rated as negligible.
United States v. DiDomenico, 78 F.3d 294, 301 (7th Cir. 1996), cert. denied, 1175 S.Ct. 507 (1996). Because eliminating access to the identities of the jurors may put a damper on a defendant’s opportunity for a thoughtful exercise of for cause and peremptory challenges, “[w]here jury anonymity is warranted, the defendant’s fundamental right to an unbiased jury is sufficiently guaranteed by the court’s conduct of a voir dire that can uncover any bias toward issues in the case or the defendant himself.” Ross, 33 F.3d at 1520.
In upholding the use of an anonymous jury in those cases in which there was a genuine security concern, *9 courts have stressed the importance of the trial judge having taken steps to insure that the voir dire would uncover any bias as to the issues in the case or as to the defendant himself. E.g., Edmond, 52 F.3d at 1092 (extensive voir dire, which inquired, among numerous other topics, into the quadrant of the city in which prospective jurors resided and their experience with crime, drugs, and law enforcement, “more than adequate to compensate for the information denied by juror anonymity . . . [and] far more extensive and detailed than the generalizations appellants might have drawn from jurors’ mere names and addresses”); Barnes, 604 F.2d at 135, 142 (expansive voir dire including questions regarding experiences with firearms or narcotics which would prevent fair consideration of the case, whether the prospective jurors had any contact with businesses to be referred to during the trial, employment with any federal or state investigatory agency, and several additional areas yielded an "arsenal of information" enabling defendant intelligently to exercise challenges); Scarfo, 850 F.2d at 1022 (extensive voir dire, which included probing general neighborhood in which prospective jurors lived, provided sufficient information to defendant).[32]
“Extensive,” “thorough,” and “searching” are not adjectives that can applied to the voir dire conducted in this case.[33] The judge did not advise prospective jurors that, as set forth in the armed robbery indictment, Dupont was alleged to have robbed drugs from Case Pharmacy in Woburn.[34] The failure to have revealed that the case concerned a defendant alleged to have robbed drugs from Case Pharmacy in Woburn made the questions that were asked insufficient to uncover persons who might have heard something about the robbery or who, upon discovering what this case was about, might react differently from other potential jurors. Without knowing the neighborhood in which the jurors lived, Dupont was also deprived of the opportunity to find out if any of the prospective jurors lived in the neighborhood of the house robberies in which he had been a suspect. Dupont was also deprived of an opportunity to form a judgment, however unscientific, about the socioeconomic background of the potential jurors from their addresses.
The court did not tell the venire that one of the charges before them would be assault with intent to murder. The crime of assault with intent to murder may engender a different emotional reaction than the charges about which they were informed. The court did ask whether any of the jurors had close relatives in law enforcement, but did not reveal that one of the persons Dupont was alleged to have assaulted by means of a dangerous weapon was a police officer or that the alleged victim in the assault to murder charge was a police officer, facts that may very well have resulted in different responses to the questions that were asked. The court did not ask the venire in general or those who came to sidebar because they had close relatives in law enforcement whether they would be more or less inclined to believe the testimony of a police officer over that of a witness who is not a police officer.[35] The court did not ask prospective jurors if they were related to any employee of the Office of the Middlesex District Attorney. The question that was asked about close relatives in law enforcement did not obligate prospective jurors to disclose an immediate family member who worked as an Assistant District Attorney or as an Assistant United States Attorney or even obligate prospective jurors to disclose if they had ever held such positions because the judge told them that he did not consider lawyers to be “law enforcement.” The court did not ask whether any of the prospective jurors or immediate family members were or had ever been pharmacists or worked in a pharmacy. The venire was told that the dangerous weapon allegedly used in some of the indictments was a firearm, but prospective jurors were not asked whether they had any contact with or concern about firearms that would affect their ability to be fair and impartial. The prospective jurors were not told that Dupont was alleged to have robbed drugs from a pharmacy[36] and were not asked whether they had any personal experiences with drugs or people who use drugs or whether they had an opinion about the use of the drugs that would affect their ability to be fair and impartial. Prospective jurors were not asked whether they or any immediate family member had ever experienced a toxic psychosis transient psychotic episode. The court also did not advise the venire that it expected one of the issues in the case to be whether the defendant was criminally responsible for any actions that he may have taken, nor did it ask whether any of the jurors had any opinion that would prevent them from returning a verdict of not guilty by reason of insanity if the Commonwealth failed in its burden of proving that the defendant was criminally responsible at the time of the alleged offenses.[37] Finally, as discussed above, the judge did not ask whether the jurors understood and accepted that the defendant was presumed innocent until proven guilty by the Commonwealth beyond a reasonable doubt or whether the jurors understood and accepted that the defendant need not present evidence in his behalf.
The empanelment of an anonymous juiy without justifiable grounds, coupled with the absence of curative, thorough questioning concerning identifiable issues connected in some way with persons, places, or things likely to arise during the trial, possibly weakened Dupont’s case. In order to establish error, it is not necessary to show that members of the jury actually were prejudiced. “The focus is exclusively on whether the procedure used for testing impartiality created a reasonable assurance that prejudice would be discovered if present.” United States v. Dellinger, 472 F.2d 340, 367 (1972), cert. denied, 410 U.S. 970 (1973). On the facts of this case, the use of an anonymous jury did not create a reasonable assurance that *10 a fair and impartial jury was selected. Compare Barnes, 604 F.2d at 143 (new trial not required where anonymous jury justifiably empaneled because “court gave counsel full opportunity for an intelligent exercise of challenges by inquiring into the essentials of the case at hand”).
C. Tradition of Identified Jurors
“The defendant has a right to a jury of known individuals not just because information such as was redacted here yields valuable clues for purposes of jury selection, but also because the verdict is both personalized and personified when rendered by 12 fellow citizens.” Sanchez, 74 F.3d at 565. When the colonists imported the jury system to America, they brought with them a system in which a defendant in all types of criminal trials traditionally had been tried by individuals whom the defendant knew or, at least was highly likely to know. The roots of the colonial jury system can be traced at least as far back as William the Conqueror. In the days before the Norman Conquest, cases in England were heard before “moots,” a “town meeting kind of body” which did not lend itself towards protecting the identity of the participants. Press-Enterprise Co. v. Nebraska, 464 U.S. 501, 505 (1984). See also Thayer, The Older Modes of Trial, 5 Harv. L. Rev. 45, 46 (1981) (“In these courts it was not the presiding officers . . . who were the judges; it was the whole company — as if in a New England town-meeting . . .”). William the Conqueror began the practice of sending barons into villages where they summoned “important men from the neighborhood,” who were placed under oath and questioned primarily about financial affairs, but criminal matters as well. J. Van Dyke, Jury Selection Procedures 2 (1977). Occasionally, a “sworn inquest of neighbors” was authorized to decide special disputes as well. Pope, The Jury, 39 Tex. L. Rev. 426, 431, n. 27 (1961). After trial and grand jury functions were separated by statute in 1352, “when one of the king’s traveling justices arrived to hear disputes, the local sheriff would choose twelve men from the immediate surrounding community to serve as jurors, and then would select an additional group of twenty-four men (usually knights) from a larger area to serve as an accusing body for the entire county.” Id. at 4. “When the jury system grew up with juries of the vicinage, everybody knew everybody on the jury . . .” In re Baltimore Sun Co., 841 F.2d 74, 75 (4th Cir. 1988). Furthermore, the procedure for jury selection under English law that would have been familiar to the drafters of the Massachusetts and United States constitutions included publicly calling out the names of the jurors. 3 W. Blackstone, Commentaries *358-59.[38]
Although the state and federal constitutions do not incorporate the “common law notion of Vicinage,’ i.e. the right to a jury drawn from the neighborhood where the crime occurred,” Commonwealth v. Duteau, 384 Mass. 321, 330 (1981), Article XIII of the Declaration of Rights provides that ”[i]n criminal prosecutions, the verification of facts in the vicinity where they happen, is one of the greatest securities of the life, liberty and property of the citizen” and the Sixth Amendment guarantees the right to trial by an impartial jury “of the State and district wherein the crime shall have been committed.”[39] (Emphasis added.)
In a modem urban society, such as Middlesex County presents, it is extraordinarily unlikely that a defendant will be aware of the identities of the prospective jurors if that information is withheld by the court.[40] The empanelment of an anonymous jury without any sound reason to do so undermines the shared values and practices which constituted the common understanding of the drafters of the Sixth Amendment and Article XIII of the Declaration of the Rights.
Conclusion
On the facts of this case, the empanelment of an anonymous jury without any reason for suspecting that withholding the identities of the jurors was essential to protect jurors from harm or improper influence, without any cautionary instructions, and without a thorough voir dire wanrants a new trial.[41] See Sanchez, 74 F. 3d at 564-65 (empanelment of anonymous jury on the basis of “mere allegations or inferences of potential risk" deemed reversible error). In Sanchez, the trial judge, like the judge in the present case, acted sua sponte and ordered redacted all identifying juror information from juror forms provided to the parties. The judge speculated that jurors would entertain fears about judging the guilt or innocence of a police officer. As in tiie present case, in Sanchez there were neither allegations nor permissible inferences of jury tampering. Dupont has demonstrated that the constitutional error possibly weakened his case in some way as to require a new trial. It appears that justice may not have been done.
ORDER
For the foregoing reasons, it is hereby ORDERED that the defendant’s motion for a new trial be and hereby is ALLOWED.

Subsequently, Dupont moved to consolidate his Rule 25(b)(2) motion with his Rule 30 motion.

Reference is made in the Rule 30 motion to the denial of a “pre-jury question conference.”

The defendant’s “Claim of Appeal” requests that “jury panel lists and jury voire dire blacked out empanelment forms” be sealed and transmitted with the entire record on appeal.

By 1995, the trial judge had retired.

Following the evidentiary hearing, Dupont terminated the services of his appointed counsel and argued pro se.

Dupont contends that there was no pro se waiver of counsel warning colloquy on August 5, 1986. There is no transcript of what transpired in court on August 5, and it is not clear whether the proceedings on August 5, 1986 were recorded. No tape of that proceeding has been located. The court reporter’s notes, if any ever existed, are not available. *11 The trial judge has advised this court that he does not have the transcript of any proceedings on August 5, 1986 in his possession, has no memory of receiving any volume of the trial transcript from any source, and does not recall any proceedings taking place on that day.

Dupont claims that the court unfairly denied his oral motion for a continuance.

There is no transcript of what transpired in court on the morning of August 7, and it is not clear whether the proceedings before the trial commenced in the afternoon were recorded. No tape of those proceedings has ever been located. The court reporter’s notes, if any ever existed, are not available. The trial judge has advised this court that he does not have such a transcript in his possession, and he has no notes nor any memory of any pre-empanelment conference or colloquy.

There is no evidence of any such experiment in Middlesex County beyond the "experiment” conducted in this case.

The trial judge, Assistant District Attorneys, courtroom clerk, and stand-by counsel have no recollection as to what information was on the copies of the juror questionnaires provided to Dupont. The trial judge reports that there is nothing in his notebook concerning the empanelment of an anonymous jury.

The Commonwealth’s jury chart contains the last names of two jurors. The surnames are written using the same pen as the rest of the information taken from the questionnaires. Examination of the original chart in its entirety demonstrates that the letters that are written next to the name Pamela spell “Cranna,” that juror’s last name, not “married” as the Commonwealth suggests. Examination of the chart also leads this court to infer that Susan’s surname was not inserted when she was selected to be an alternate. The chart does not contain the surnames of the remaining alternatives, and its reference to Susan as “(alternate)” obviously is written using a pen different from that used for her surname. Pamela’s last name was not revealed when she was excused on August 11.

Dupont, who had no reason to believe that his trial would be starting on August 7th, was still in prison garb, a grey shirt and denims; his attire did not reflect the name of any institution.

The clerk did not read the indictments at this time.

The name in the indictment is Lewis Dalton.

When he mentioned armed robbery, Dupont objected on the grounds that that indictment was under a motion to dismiss. The Court then repeated the words “armed robbery” twice.

At times, a prospective juror repeated her first name, corrected the court, or simply started discussing the reason why the individual had responded affirmatively.

The court did not ask whether any of the venire had themselves in the past been in law enforcement. Furthermore, when he asked this question, the judge added, "Lawyers I don’t consider law enforcement.” The court did not ask whether any of the potential jurors had close relatives who practiced law as assistant district attorneys in Middlesex or any other county or whether any of the members of the venire had been assistant district attorneys.

One prospective juror, who reported being familiar with one of the police officers and the owner and staff of the Case Pharmacy and former owner of that pharmacy, was excused upon his representation that he was prejudiced.

Dupont did not use his full complement of peremptory challenges.

The Commonwealth’s argument that Dupont has not demonstrated that evidence concerning the other robbery was material to his case is irrelevant. The defendant would have been interested in any persons living close to that other pharmacy whether or not evidence of that other robbery would be introduced in his trial. Because the judge did not tell the jurors that the armed robbery at issue involved theft of drugs from a pharmacy, the questions he did ask with respect to opinion or bias were not likely to trigger a response from a prospective juror, if any, who lived near that other pharmacy.

The transcript reads: “ — occupational background — ”

During the charge, on August 27, 1986, the court again instructed the jurors about the presumption of innocence.

 A substantial risk of a miscarriage of justice is established if (1) there is a genuine question of guilt or innocence; (2) the error is sufficiently significant in the context of the trial to make plausible an inference that the result might have been otherwise but for the error; and (3) the record supports a finding that [the] failure to object was not simply a reasonable tactical decision. Commonwealth v. Miranda, 22 Mass.App.Ct. 10, 21 (1986). See also Commonwealth v. Amirault, 424 Mass. 618, 650 (1997).

Dupont’s appeal was dismissed on June 17, 1993 for lack of prosecution.

Dupont has served his sentences on each of the convictions other than armed robbery, but he is continuing to challenge each such conviction.

See also United States v. Tutino, 883 F.2d 1125, 1132 (2d Cir. 1989) (strong evidence that defendant, who was facing serious penalties, had attempted to influence three jurors in a prior action), cert. denied sub nom. Guarino v. United States, 493 U.S. 1082 (1990); United States v. Scarfo, 850 F.2d 1015, 1017 (3d Cir.) (pre-trial proceedings revealed defendant implicated in murder of prospective witness and judge and attempts to bribe other judges), cert. denied, 488 U.S. 910 (1988); United States v. Persico, 832 F.2d 705, 717 (2d Cir. 1987) (violent acts allegedly committed in the normal course of business of the Colombo Family and Family’s willingness to corrupt and obstruct criminal justice system), cert denied sutr nom. Cataldo v. United States, 486 U.S. 1022 (1988); UnitedStates v. Barnes, 604F.2d 121, 134n.3 (2d Cir. 1979) (defendants, allegedly engaged in notorious narcotics distribution ring, had a “sordid history of attempts at influencing witnesses and jurors” in similar cases within the district), cert. denied, 446 U.S. 907 (1980).

See also United Statess v. Riggio, 70 F.3d 336, 340 n. 23 (5th Cir. 1995), cert. denied, 517 U.S. 1126 (1996) (court took effective steps to minimize any prejudicial effects associated with anonymous jury by giving careful instructions to the jurors, “explaining that Üie use of numbers instead of names for them was standard procedure in criminal cases”); United States v. Edmond, 52 F.3d 1080, 1093 (D.C. Cir.) (jurors told anonymity was a common practice which protected their privacy and the curative instruction was followed immediately by an instruction on the presumption of innocence which was repeated at the trial’s beginning and conclusion), cert. denied, 516 U.S. 998 (1995); Tutino, 883 F.2d at 1133 (judge told jurors anonymity was common practice in federal court and issued instructions on the presumption of innocence distributed to prospective jurors and during trial); Scarfo, 850 F.2d at 1027 (jurors told anonymily was not a reflection on the defense but a precaution designed to ensure that both sides obtained a fair trial); Thomas, 757 F.2d at 1369 (trial judge told jurors they would remain anonymous because the publicity and curiosity of others could possibly impair their impartiality); Barnes, 604 F.2d at 137 (jurors told that anonymity was to protect privacy of jurors from media inquiries and to guard against anything interfering with their impartiality).

After the evidence was presented, the court gave the Webster charge, but also instructed the jury that he wanted each juror “to be able to stand with courage to say I returned a true verdict of not guilty because the Commonwealth has *12 not proven to my satisfaction beyond a reasonable doubt the guilt of the defendant On the other hand, if your verdict in any one of these is guilty, I want you to be equally certain...” (Emphasis added).

That statute provides that “[u]pon motion of either party, the court shall... examine on oath a person who is called as a juror therein, to learn whether he is related to either party or has any interest in the case, or has expressed or formed an opinion, or is sensible of any bias or prejudice, therein; ... If the court finds that the juror does not stand indifferent in the case, another shall be called in his stead. In a criminal case such examination shall include questions designed to learn whether such juror understands that a defendant is presumed innocent until proven guilty, that the commonwealth has the burden of proving guilt beyond a reasonable doubt, and that the defendant need not present evidence in his behalf. If the court finds that such a juror does not so understand, another shall be called in his stead.” The third and fourth sentences were added in 1985.

Commonwealth v. Fudge, 20 Mass.App.Ct. 382, 388 (failure to request examination of jurors under G.L.c. 234, §28 constitutes waiver), rev. denied, 396 Mass. 1102 (1985).

The jury orientation videotape transcript proffered by the Commonwealth does not undercut the defendant’s position that jurors were not made aware of the presumption of innocence at the outset. Although the transcript correctly sets forth the Commonwealth’s burden of proof, it makes no reference to the presumption of innocence that must be accorded to the defendant. Cf. Dodson v. United States, 23 F.2d 401, 403 (4th Cir. 1928) (failure to charge on presumption of innocence is not cured by correct charge on burden of proof). Finally, it would not be unusual for late-arriving prospective jurors to enter while the videotape was being shown, making it unclear whether each of the jurors ultimately selected actually heard the entire videotape.

See also United States v. Salvatore, 110 F.3d 1131, 1144 (5th Cir. 1997), cert. denied, 118 S. Ct. 442 (1997) (neither information that could be gleaned from questionnaires nor voir dire “deficient in any way” and, therefore, empanelment of anonymous jury adequately protected defendant’s rights); United States v. Branch, 91 F.3d 699, 724 (5th Cir. 1996), cert. denied, 117 S. Ct. 1466 (1997) (defendant did not argue that the detailed information obtained from the jury questionnaires was deficient); United States v. Wong, 40 F.3d 1347, 1377 (2d Cir. 1994), cert. denied, 514 U.S. 1113 (1995) (adequate precautions taken to safeguard constitutional rights when court questioned prospective jurors about their familiarity with the case, the defendants and the crime scenes, and inquired about their neighborhoods and other matters); United States v. Thornton, 1 F.3d 149, 154 (3d Cir. 1993), cert. denied, 510 U.S. 982 (1993) (defendant did not claim that empaneling of anonymous jury limited ability to conduct voir dire); Vario 943 F.2d at 241-42 (searching voir dire designed to uncover biases as to case and defendant allowed to exercise challenges meaningfully); Tutino, 883 F.2d at 1133 (extensive and thorough voir dire in which jurors were questioned about their neighborhood and ethnic background); Wagner v. United States, 264 F.2d 524, 527 (9th Cir. 1959) (anonymity of jurors not violate constitutional rights because trial court “responded favorably to practically every request of appellants’ counsel concerning questions to be propounded to prospective jurors”).

Furthermore, although it was unintentional, the Commonwealth had access, during the empanelment, to the names of two jurors while Dupont did not have access to the names of any of the jurors,

Revealing that one of the witnesses was “Richard Merino care of Case Pharmacy of Woburn” did not put all the potential jurors on notice that Dupont was alleged to have robbed that establishment.

The court simply asked each person disclosing a close relative in law enforcement whether that would affect the juror's ability to render a fair verdict solely on the evidence and the law.

The jury heard evidence that the defendant ordered a pharmacist, at gun point, to give him Class A narcotics, including percocet, codeine, demerol, and barbiturates.

When they deliberated, the jurors had the option, with respect to each of the indictments, of finding the defendant not guilty by reason of insanity.

The names of the jurors were also returned by the sheriff to the court prior to trial so that the parties could become familiar with the “sufficiency or insufficiency, characters, connections, and relations” of the jurors. 3 W. Blackstone, Commentaries *353-55.

When the 1787 Constitution guaranteed only trial by a jury “in the state” where the crime had been committed, there was a public outcry. Patrick Henry declared: “Juries from the vicinage being not secured, this right is in reality sacrificed. All is gone . . .” Van Dyke, supra at 7. The Bill of Rights responded to that concern.

“[T]he anonymity of life in the cities has so changed the complexion of this country that even the press, with its vast and imaginative methods of obtaining information, apparently does not know and cannot easily obtain the names of the jurors and of the veniremen and women who did not serve in this case.” In re Baltimore Sun Co., 841 F.2d at 75.

The court finds that the alternative relief sought in the amended motion — dismissal of the indictments “due to twelve year prejudicial obstruction of appeals” — is unwarranted. The defendant’s affidavit does not, as the defendant contends, demonstrate “a pattern of deliberate and prejudicial obstruction and inordinate delay.”